[No. A095846. First Dist., Div. Two. July 23, 2004.]

YVETTE MUNOZ et al., Plaintiffs and Respondents, v.
CITY OF UNION CITY et al., Defendants and Appellants.

COUNSEL

Farmer, Murphy, Smith & Alliston, George E. Murphy, Suzanne M. Nicholson; Ferguson, Praet & Sherman and Bruce D. Praet for Defendants and Appellants.

Gwilliam, Ivary, Chiosso & Brewer, Steven R. Cavalli; Law Office of Daniel U. Smith and Daniel U. Smith for Plaintiff and Respondents.

OPINION

**RUVOLO, J.—**

## I.

### INTRODUCTION

Lucilla Amaya was shot and killed by a Union City police officer after her brother summoned police assistance to the house in which Lucilla,[1] under the influence of methamphetamine and armed with two knives, was located with her father and daughter. In a suit by Lucilla's relatives (respondents) against the City of Union City, the Union City Police Department, and the Union City Chief of Police (collectively referred to as Union City or appellants), as well as Union City Police Corporal Tod Woodward (referred to as Woodward or collectively with Union City as appellants) a jury found appellants liable for negligence and battery.

---

[1] This opinion will use first names for the members of the Amaya family in the interest of simplicity, as several share the same surname. No disrespect is intended.

Union City and Woodward contend the judgment must be reversed because they owed no legal duty to Lucilla, principally relying on our 1998 opinion in *Adams v. City of Fremont* (1998) 68 Cal.App.4th 243 [80 Cal.Rptr.2d 196] (*Adams*). They further argue that reversal is required because no reasonable juror could have found that the use of deadly force under the circumstances was unreasonable, and the trial court refused to instruct the jury on the objective test for reasonableness as to the alternative excessive force (battery) cause of action.

We affirm in part, concluding that Woodward owed a duty of care not to use deadly force in an unreasonable manner, the breach of which in this case is supported by substantial evidence. Accordingly, Union City is also liable for that portion of the judgment attributable to Woodward's negligence under undisputed principles of vicarious liability. However, we reverse that portion of the jury's verdict against Union City based on its direct negligence under authority of our Supreme Court's recent decision in *Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175 [7 Cal.Rptr.3d 552, 80 P.3d 656] (*Eastburn*), because the direct negligence theory advanced by respondents was not grounded on a violation of a statutory duty by the public entity (Gov. Code, § 815).

## II.

### STATEMENT OF THE CASE

The incident in which Lucilla was killed occurred on March 7, 1998. A government tort claim against appellants was filed by Lucilla's daughter Yvette Munoz, Lucilla's father Jessie Amaya, and Lucilla's brother J.J. Amaya (collectively referred to herein as respondents). After this claim was rejected, respondents filed a complaint for damages in Alameda County Superior Court on November 25, 1998. The complaint alleged causes of action for negligent and intentional wrongful death, infliction of emotional distress, negligence per se, negligent employment and failure to supervise and train employees, respondeat superior, violation of civil rights and injunctive relief. Union City and Woodward filed a demurrer on April 7, 1999, which was sustained as to the civil rights cause of action, with leave to amend.

Respondents' first amended complaint was filed on June 7, 1999. Union City and Woodward filed their answer on August 9, 1999. Subsequently, respondents dismissed their civil rights and negligence per se causes of action.

Jury trial began on March 28, 2001. On May 10, 2001, the jury returned a special verdict finding Woodward and Union City liable for negligence and battery (unreasonable force). The jury awarded $1,781,200 to Yvette, $131,000 to Jessie and $23,400 to J.J. The jury apportioned the negligence that caused respondents' damage as 50 percent to Woodward, 45 percent to Union City and 5 percent to Lucilla. Judgment was entered on May 14, 2001, and notice of entry of judgment was filed on May 16, 2001. A motion by all appellants for a new trial was denied on July 11, 2001. A remittitur was issued to correct a clerical error in the judgment regarding the damages awarded to Jessie. Union City and Woodward's notice of appeal was timely filed on July 31, 2001.

## III.

### Factual Background

At about 5:30 a.m. on March 7, 1998, Jessie Amaya was awakened by his wife, who told him that Lucilla had called and was hallucinating. Jessie went to Lucilla's house and knocked on the front door. Lucilla opened the door and asked what Jessie was doing there, then told him to sit on the couch. After she closed the door, Jessie noticed that Lucilla had a knife in each of her hands. In response to his question why she was holding the knives, Lucilla said she was scared of someone in the back room whom she referred to as "Uncle George." Jessie looked in the back room and tried to assure Lucilla that no one was there, but she did not believe him. He sat back down on the couch and from then on, Lucilla became agitated if he tried to move. Jessie tried to calm her down and she told him to "stay the hell away" from her. Lucilla's hands were hanging at her sides and she refused to put down the knives. Lucilla's daughter, Yvette, tried to coax her mother to go to bed, but Lucilla told her to "stay the hell away" from her. Yvette followed her grandfather's direction to go back to her room and tried to go back to sleep. At some point shortly after Jessie had arrived, Lucilla asked if he had brought a gun; he said he had not and asked why she would need one; and she pointed her finger to her head, simulating a gun.

Meanwhile, Lucilla's brother, J.J. Amaya, having received a call from their mother, had gone to stand outside Lucilla's house and observe what was happening. He saw the wooden front door open and Lucilla standing with her back to the wooden door and right shoulder to the security screen door. He could hear Lucilla yelling, "I am tired of men using me. I am tired of men taking advantage of me. I am tired of men, the men in my life." Lucilla was very upset; J.J. heard her cry and moan and felt she needed help. He returned to his home a short walk away and, after talking to his mother, called his father at Lucilla's house.

On the phone, Jessie confirmed that Lucilla was holding a knife in each hand. J.J. asked for permission to call the police and Jessie reluctantly agreed, because "they were the professionals. They knew how to handle things like that." About six months before, the police had been called and Lucilla had been hospitalized for a couple of days because of an incident in which Lucilla was upset and holding a knife. On that occasion, Lucilla had complied with the police request to come outside and had gone willingly with them.

At some point, Lucilla looked out the door and realized J.J. was outside. She seemed startled. Lucilla was stabbing the door behind her with the knives, as she had been throughout the incident. Jessie tried to stand up from the couch to hug Lucilla but she yelled at him not to move and he sat back down. Jessie did not try to take the knives away from Lucilla because she had not threatened anyone and he thought it would agitate her if he tried to remove the knives.

Believing the situation was not an emergency, J.J. called a nonemergency police line rather than dialing 911. The dispatcher who took his call at 6:12 a.m. testified that J.J. reported his sister was under the influence of something, had been "5150" in the past and was in possession of a knife. He said he thought his sister might harm herself and he was concerned about his father and niece, who were in the house with his sister. He did not say his father or niece were being threatened. The dispatcher did not recall J.J. saying that his sister or anyone else was in possession of a gun. J.J. provided his own and Lucilla's phone numbers, but suggested that the police not call Lucilla's house because he was afraid this might escalate the situation. When the dispatcher told J.J. the duty sergeant was on an emergency call, he said he was beginning to think the situation was going to escalate to an emergency and the dispatcher told him to call back on 911 if this occurred.

The acting watch commander on duty at this time was Corporal Tod Woodward, who had assumed this role because the sergeant on duty had gone home early. Woodward had been on the SWAT team for about five years but did not have specific training as a supervisor in a crisis situation. Since assuming the rank of corporal in June 1997, Woodward had responded to a critical situation as a supervising officer on two occasions that he recalled; he had not had occasion to respond as a supervising officer to a call involving a barricaded suspect, a potential "5150" or a person under the influence of a "central nervous stimulant" and he had no formal training in hostage negotiation.

When he heard the broadcast of a " '5150' with a knife," Woodward had the dispatcher direct Officers Kruger and Housley to respond. The two officers were dispatched to the scene at 6:19 a.m. Officer Kruger directed the

dispatcher to get information updating the situation and the dispatcher called Lucilla's house. Jessie told the dispatcher that Lucilla was still at the front door and still held two knives. Kruger recalled the dispatcher informing him that the suspect was at the front door with one knife, although when he reviewed the dispatch tape before his deposition in this case, he heard the dispatcher say the suspect had two knives.

Neither Kruger nor Housley activated their red lights and sirens as they approached Lucilla's house, not wanting to aggravate the situation. As Kruger neared the house, he was flagged down by J.J., who said that his sister and father were in the house, his sister was very agitated and had a knife and he was concerned about his father's welfare. Kruger did not recall telling Sergeant Bizieff, after the incident, that J.J. had reported his sister being suicidal. J.J. was very concerned about Lucilla's reaction to the police arriving, fearing the situation might escalate.

Kruger and Housley parked their vehicles out of sight of the house; Kruger walked to about 20 feet from the front door and Housley remained about five feet further back. Lucilla was standing with her back to the open front door and the right side of her body by the screen door. Kruger spoke to her in a calm tone of voice, trying to establish a dialogue, but she told him to "stay back, don't come any closer." J.J. testified that Kruger spoke to Lucilla calmly, asking what the problem was and saying he was there to help her, and that Lucilla responded, "[N]o. You're here to hurt me."

Kruger and Housley described Lucilla as jumping up and down, "throwing her body around vigorously" and moving her arms and hands around, allowing the officers to observe what appeared to be a steak knife in her left hand. Kruger testified that he did not see anything in Lucilla's right hand although he did see her right hand briefly; Housley testified that he could not see Lucilla's right hand because it was concealed behind the latch plate on the screen door.

Neither Kruger nor Housley heard Lucilla make any threats during the incident. Lucilla alternated between being very excited and calming down, speaking coherently and incoherently. Kruger heard a male voice in the house and had the impression the person was trying to calm Lucilla down. He also saw a young woman in the house. Kruger and Housley felt the people in the house were in danger because Lucilla was "completely irrational," unpredictable and waving a knife around.

After about two minutes, Lucilla was becoming increasingly agitated and Kruger felt he was not going to be successful getting Lucilla to talk to him. He called Woodward to the scene, telling him there was an armed suspect in

the house with another person. Woodward arrived after approximately two minutes. Kruger recalled that he did not at this point have his weapon drawn, but drew it at some point after Woodward arrived, although Housley recalled that he and Kruger both had weapons drawn before Woodward arrived.

Woodward spoke with J.J. for three to five minutes. According to Woodward, J.J. said his sister was in the house with a knife, that she had been a "5150" on a prior occasion, that she might be under the influence of methamphetamine and that she was threatening to harm his father and his niece. J.J. denied telling Woodward that he felt Jessie or Yvette were in danger. Woodward directed Kruger to get more information from J.J. and directed Officer Holbrook, a canine officer who by then had also arrived on the scene, to check the back of the house for means of access into the house or communication with the occupants. Woodward testified that Holbrook reported the back door would not be a viable entry point; he had testified at his deposition that Holbrook told him the back door was locked. Holbrook testified that he never checked whether the sliding door was locked because he determined that the door was not a viable entry point due to Lucilla having a direct line of sight to the door.[2]

Woodward approached the front of the house, positioning himself in front of a white car in the carport. He spoke to Lucilla in a calm tone of voice, trying to coax her to put down the weapons and come outside to talk to him. He did not try to determine whether the screen door was open or locked because Lucilla was demanding that he stay back and he did not want anyone to get hurt. Lucilla remained in the same position, with her back to the door and her right shoulder an inch or so away from the screen door. Woodward could see the blade of a knife in her left hand; her right hand was concealed behind the latch plate of the door.

After talking to J.J. and having him draw a floor plan of the house on an index card, Kruger returned to stand about three feet behind Woodward. Lucilla was telling Woodward to stay back. Woodward had his weapon drawn and pointed at the ground. He had ordered all the officers at the scene to turn off their radios, to avoid the risk of the situation escalating if Lucilla heard a potential call for the SWAT team. Woodward testified that he ordered cessation of all nonemergency calls because he did not want to "clog the airways with useless information or unnecessary chat." Less than a minute after Kruger returned to Woodward's position, Woodward directed Kruger to get a shotgun from the car. Kruger heard Woodward ask Holbrook to notify Sergeant Tyser of the situation. Tyser was the sergeant due to come on duty at this time and was a member of the SWAT team.

---

[2] Yvette testified that there was no lock on the sliding door.

Woodward testified that as he tried to talk to Lucilla, he moved forward, retreated when she told him to "back off," then moved forward again. Woodward felt as long as she was focused on him she would not kill her relatives. Within about three minutes of beginning to talk to Lucilla, Woodward told Holbrook to call for the SWAT team. Holbrook testified that he had not heard Lucilla make any threats to herself or others at the point he was given this direction.

Woodward testified that he did not become irritated with Lucilla or raise his voice at her, although he did raise his voice when speaking to the other occupants of the house so they would hear him. Lucilla was sporadically pointing the knife at her father, gesturing in a threatening manner. She told Woodward that she wished Dennis Benetez, a Union City police officer, were there; Woodward told her he could get Benetez for her but did not attempt to do so because there was not enough time. At some point, the door "jiggled" and Lucilla said she was "going to fly out full force." When Woodward asked what she meant, Lucilla told him she had a knife in one hand and a gun in the other. Woodward could see Yvette in the house and she appeared to be scared. Woodward told Lucilla that if she let the other people in the house go into the back room, she could come outside to talk to the police or they could come inside to talk with her. When nothing happened, he repeated this more loudly. Woodward denied that he directly ordered the people in the house to go to the back room, stating that he was concerned this might have agitated Lucilla even more. J.J., however, testified that he heard first Woodward and then Kruger yell, "you in the house, go to the back room and lock the door." Lucilla's neighbor also heard an officer yell to the people in the house to go to the back room and lock the door. Jessie testified that the officer at the front door told him, "Hey you in the house, go to the back bedroom and close the door."

Woodward saw Jessie and Yvette move out of view. Lucilla watched them, looked at Woodward, then took the knife forward and began moving. Woodward raised his gun and pleaded with her, "Please don't, please don't." She looked into the barrel of Woodward's gun, looked back at her family members, looked back at Woodward, and said, "I am going to stop my father from hurting me. He is not going to hurt me any more." She made a movement forward, thrusting with the knife. Thinking she was going to kill her father and daughter, Woodward shot five times, until she stopped. Jessie, Yvette and J.J. all testified that they heard Lucilla scream just before the shots were fired. Woodward testified that when he fired the first shot, Lucilla had moved six inches from the front door and he estimated she was 10 feet from where her father and daughter had disappeared from view, a distance he felt

she would cover in two seconds. Expert testimony placed Lucilla further from the door at the time she was shot. Woodward testified that he intended to stop the threat Lucilla posed to her relatives and denied having shot Lucilla with intent to kill. Approximately nine minutes had elapsed from the time Woodward arrived at the scene to the time Lucilla was shot. Sergeant Tyser arrived at the scene two minutes after the shooting.

Housley recalled that at some point Woodward asked Lucilla if she had a gun and she said she had a gun in her right hand. Housley moved closer, although he acknowledged he put himself in a position that violated his training by not assuming a position of cover in the presence of a person claiming to have a gun. Lucilla became more excited and Housley moved to a position by the front window of the house. Woodward and Holbrook, in front of the door, also moved closer. Housley heard Woodward order the occupants of the house to go into a back room and shut the door. He heard Woodward say something like, "no, no, please don't, please don't," in a pleading tone, "very soft spoken yet desperate." Housley then heard shots. By this time, Woodward had moved "very close" to the screen door, with Holbrook directly behind him. Housley did not hear Lucilla scream before the shots were fired. He heard J.J. saying "you better not have shot my sister." Housley entered the house and found Lucilla on the floor, moving. In accordance with his training, he handcuffed her behind her back because he did not know where a gun or knife might be. He did not see any knives or guns. He never heard Woodward yell at Lucilla or say anything Housley felt was provoking. He denied telling Woodward, "I can't believe you shot her." He had been told that J.J. claimed to have heard him say this and stated that such a claim was a lie. Housley testified that J.J. did not get close to the front door of the house after the shooting.

Kruger was returning from the car with the shotgun when he heard three or four shots. He decided to secure the shotgun and get a halogen tool he had in the car so he could get into the house quickly. Kruger had in the past used this tool to open a door identical to Lucilla's "very quickly." He had not attempted to use it on this occasion because he believed that doing so would put the people in the house at additional risk.

Kruger went to the front door, which was now wide open, and heard J.J. saying words to the effect of, "You didn't shoot her. You didn't shoot her." Woodward and Officer Holbrook were inside; Lucilla was lying on her stomach on the floor and Kruger could see two gunshot wounds. Officers Souza and Rodriguez arrived at the scene shortly after the shots were fired, and Sergeant Tyser arrived about three or four minutes after the shots. Kruger estimated that five to seven minutes elapsed from the time Woodward arrived at the scene to the time the shots were fired.

J.J. testified that he ran toward the house upon hearing the shots. He heard one of the officers say, "I can't believe you shot her, I can't believe you shot her." At the front door, J.J. said to Woodward, "You better not have shot her, you better not have hurt her." Officer Holbrook, who had run toward the house at the same time as J.J., asked what had happened and Housley said, "he shot her, she was standing, she was standing at the front door and he shot her."

Jessie testified that when the police first arrived at the house, about 10 minutes after Jessie talked to J.J. on the phone, Lucilla was startled and said, "Oh no, you called the cops." Lucilla's attention shifted from Jessie to the police. Jessie heard an officer speak to Lucilla in a calm tone of voice, offering to help her. Lucilla told him she had been hurt by a lot of men in the past. Lucilla was upset, alternating between coherence and incoherence. The officer talked to her for what seemed like 10 to 15 minutes but Lucilla told him to stay away from her. Lucilla talked about "Uncle George" and at one point said she thought he was going out a back door. When a second officer replaced the first one, asking Lucilla to "drop the knives and talk to him," Lucilla said, "[N]o, no no. Leave me alone. . . . You are going to hurt me. You are going to hurt me. Stay away, stay away." The officer's tone changed, with him yelling at her more and appearing frustrated with her. Jessie never heard Lucilla say she had a gun in one hand and a knife in the other and never saw a gun in the house during the time the police were there. He did not hear her threaten him, Yvette or the police. The only time she pointed one of the knives at him or Yvette was when the police asked where her father was and she pointed with the knife. After Lucilla was shot, Jessie found her lying on her back on the floor with her arms spread out and the knives "resting on the palm of her hand."

Yvette testified that when she first came out of her room upon hearing the police had arrived, the officers did not have their guns drawn. After a while, the police "got frustrated," took out their guns and held them at their sides. Yvette concluded they were frustrated because their "tone of voice" was "getting louder and louder." Yvette saw Lucilla holding a steak knife in each hand, pointed toward the floor. Lucilla moved her arms around from time to time but did not threaten anyone. Yvette testified that the officers initially tried to calm Lucilla down, then "started getting really irritated, agitated and raising their voice [sic]." Yvette heard Lucilla ask for Dennis Benetez. The officer who was standing four or five feet from Lucilla yelled at Yvette and her grandfather to go into the back room; Yvette did so reluctantly. Lucilla had become more agitated, scared because the officers had their guns out and were not listening to her tell them to stay back. Yvette never heard Lucilla tell the police that she had a gun in one hand and a knife in the other and never saw a gun; Lucilla did not keep a gun in the house.

Lucilla's neighbor, Mary Diaz, heard the police outside her window and heard an officer telling Lucilla he wanted to help and was not going to hurt her. Lucilla was saying she was tired of people hurting her and she wanted Dennis, a friend of hers in the police department. Diaz heard Lucilla say she saw her Uncle George running from the side of the house and heard the officer say he did not see anyone. She also heard Lucilla saying she was tired of all the men in her life and telling the police to stay back. As the minutes passed, Diaz heard a change in the tone of the officer talking to Lucilla: His voice became louder and he sounded frustrated. Diaz thought he sounded mean. At some point, in response to the officer asking Lucilla to come outside, Lucilla said she "had a knife in one hand and a gun in the other and if she came out she was going to come out in full force." Diaz did not hear Lucilla say anything threatening to her father or daughter and did not hear any warnings by the police before she heard shots fired. A few seconds before the shots, Diaz heard the officer yell to the people in the house to get to the back room and lock the door.

Diaz's mother also testified that initially the officer speaking to Lucilla sounded "calm," then his voice got "harsh," louder and more demanding. Alicia Diaz heard Lucilla say she had a gun but did not hear an officer ask if she had a gun before this.

Woodward testified that he never heard Lucilla threaten Yvette, the initial dispatch he received did not indicate the suspect was threatening family members and that he did not recall any broadcast referring to family members.

Respondents presented the testimony of Peter Reedy, a former Sacramento police officer who owned a consulting business called Situational Crisis Management. Reedy had been a police officer for 25 years, approximately 15 of them as a supervising officer, had taught crisis negotiations and management to other officers and police agencies and had been the supervisor of a hostage negotiation team. During his career as a police sergeant, Reedy responded as supervising officer to critical incidents hundreds of times and was called to critical incidents as a negotiator some 70 times. On two of these occasions, the subjects were killed, and in both Reedy had recommended that the police wait out the situation rather than going after the barricaded subject.

Reedy acknowledged that the minimum standards for peace officers' training in California is set by the Peace Officers Standard of Training (POST), that the last time he had attended a POST training was over a decade before trial, and that he had never been certified as a POST instructor. Since retiring from the police force, Reedy had been retained to testify in

approximately 63 civil cases, two-thirds of the time for plaintiffs and one-third for the defense. In preparation for the present case, Reedy spent some 100 hours reviewing police reports, hospital records, transcripts of interviews, statements and depositions, audio and video tapes, photographs, and other documents.

Reedy described six "important factors for the successful handling of a critical incident of a crisis situation," which he referred to as the "6 C's." These factors are containment (setting up a perimeter on the incident), control (of people interfering with the scene and of officers themselves), confirmation (getting the facts), calm (maintaining distance and composure), communication (two-way communication, including negotiators) and command (by an experienced, educated, trained commander who does not become directly involved in the incident). Reedy testified that the most "explosive" point in a critical incident, when people are most often hurt, is the police assault; the second most dangerous point is the first 45 minutes.

Reedy offered the opinion that Woodward's actions were unreasonable because he violated the "6 C's" in a number of ways, including failing to set up a perimeter to contain the situation, getting too close to Lucilla, getting personally involved rather than maintaining his role as supervisor, failing to take the time to confirm facts through relatives and neighbors, failing to use a hostage negotiator, failing to establish real communication with Lucilla or to communicate with dispatch or Benetez, and having a weapon drawn while talking with Lucilla. Reedy testified that Woodward had insufficient training and experience to be the supervising officer at an incident such as this and that Woodward's use of deadly force was unreasonable.

The defense expert, George Williams, had never been a police officer due to physical injuries, but had been training police officers for 20 years. He was a POST-certified master instructor, and was a certified instructor in various defensive tactics and weapons for police officers.[3] He estimated that he had trained at least 12,700 officers and had conducted trainings for hundreds of state agencies and agencies in 26 other states and 14 foreign countries. He had been an instructor for the California Specialized Training Institute (CSTI), training officers and government officials on how to respond to various crisis situations. Williams had also worked for the Tracy Police Department training officers, SWAT members and supervisors and had conducted force review to determine whether force used by the officers was

---

[3] Williams explained the master instructor program as a "year-long certificate program where POST brings in the top trainers of law enforcement to create a higher level of commitment, a higher level of understanding how to develop and present programs to officers."

reasonable. Since 1996, Williams and his wife had run their own company conducting training nationwide. About 30 percent of Williams's business was consulting, almost all of which was for police officers' defense. All but one of the civil cases in which he had been retained were on behalf of a law enforcement officer or agency. Williams did not have specific training in hostage negotiation and was not a hostage negotiator. In preparation for this case, he had reviewed the same documents as Reedy.

Williams opined that what the officers in the present case did was "reasonable based on their training, based on what we expect and pay them to do." Williams had not heard of Reedy's "6 C's" before reading Reedy's deposition but testified that the officers acted in accordance with these standards. He testified that setting up a perimeter in this case would not have been indicated because there were a limited number of officers and there was no concern with Lucilla leaving the house. Williams felt the officers controlled as much of the situation as they could and did not lose control of themselves, that they confirmed information by contacting J.J. and Lucilla, that the neighbors reported the officers remained calm and were not yelling, cursing or threatening, that Woodward's order to turn off radios was a proper tactical response because of how close the officers were to Lucilla, and that Woodward had command of the officers. According to Williams, Woodward "took charge of the situation exactly how he was supposed to. What he did was reasonable."

Williams testified that based on the information known to him at the time, Woodward's use of deadly force was reasonable. Given the door, which did not allow Woodward to get to Lucilla, there was no lesser force he could have used in this situation; Williams stated that it was not reasonable to think anyone could have entered the front door and crossed the distance to disarm Lucilla without using deadly force. A Taser would not have worked through the door, Mace could not have been delivered effectively through the door, and tear gas would not have been appropriate. According to Williams, there was no way Woodward could have safely tried to evacuate Jessie and Yvette from the house, but Woodward did evacuate them from the immediate area of the living room. Williams did not believe entry through the rear sliding door was a realistic or tactically sound option because the entry would have alerted Lucilla, potentially heightening her fear and anxiety. Because police officers are trained not to tackle a person armed with a knife, Lucilla still would have faced deadly force if she had made any move toward the officers or others in the house. Williams also testified that police officers are trained to believe a person who claims to have a gun until the claim is disproved. Once Lucilla said she had a gun, it was tactically sound for Woodward to remain in his position in order to monitor her actions and the other occupants' positions,

and to react if necessary. Williams testified that it was Lucilla's conduct, not Woodward's, which led to the need for deadly force. Williams did not view this as a hostage situation, which he said was one in which the suspect was using a hostage as leverage against law enforcement.

Defense expert Dr. Alex Stalcup testified that methamphetamine is a stimulant. Methamphetamine intoxication is characterized by a "waxing and waning of distress," periods of increasing agitation alternating with periods of calm. Stalcup opined that Lucilla's behavior was consistent with methamphetamine use in that she was observed to vacillate between agitation and calm and appeared to be hallucinating or paranoid. Stalcup additionally testified that police officers are trained to maintain "social distance" when approaching someone on methamphetamine, starting at seven to 10 feet and gradually moving forward; to speak in a soothing or reassuring tone of voice and not yell; to avoid sudden motions; to keep weapons hidden; and to maintain two-way dialogue.

## IV.

### Liability of Woodward

### A. Woodward's Duty of Care

■ Union City and Woodward argue they cannot be held liable for negligence in Lucilla's shooting because, as a matter of law, they had no legal duty of care toward Lucilla. "Public entities are . . . liable for the negligent acts or omissions of their employees acting within the scope of their employment except where either the employee or the public entity is immunized from liability by statute. ([Gov. Code,] § 815.2.) . . . Where a legal duty is not created by statute, the question of whether a legal duty exists is analyzed under general principles of tort law. (See, e.g., *Brenneman v. State of California* (1989) 208 Cal.App.3d 812, 818 [256 Cal.Rptr. 363] . . . .)" (*Adams, supra*, 68 Cal.App.4th at p. 264, fn. omitted.)

" '[I]n order to prove facts sufficient to support a finding of negligence, a plaintiff must show that defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury. [Citation.]' (*Nally* [*v. Grace Community Church* (1988)] 47 Cal.3d [278,] 292–293 [253 Cal.Rptr. 97, 763 P.2d 948], italics omitted.) [¶] The existence of a duty of care is a question of law to be determined by the court alone. (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 572, fn. 6 [224 Cal.Rptr. 664, 715 P.2d 624]; *Stout* [*v. City of Porterville* (1983)] 148

Cal.App.3d [937,] 942 [196 Cal.Rptr. 301]; *Peter W. v. San Francisco Unified Sch. Dist.* (1976) 60 Cal.App.3d 814, 822 [131 Cal.Rptr. 854]; *Raymond v. Paradise Unified School Dist.* (1963) 218 Cal.App.2d 1, 8 [31 Cal.Rptr. 847].) This is because 'legal duties are . . . merely conclusory expressions that, in cases of a particular type, liability should be imposed for damage done.' (*Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 434 [131 Cal.Rptr. 14, 551 P.2d 334].) Duty is simply a shorthand expression for the sum total of policy considerations favoring a conclusion that the plaintiff is entitled to legal protection. (*Dillon v. Legg* (1968) 68 Cal.2d 728, 734 [69 Cal.Rptr. 72, 441 P.2d 912].)" (*Adams, supra,* 68 Cal.App.4th at pp. 264–265; see *Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 472–473 [63 Cal.Rptr.2d 291, 936 P.2d 70] (*Parsons*).)

As set out in detail above, respondents' claims against Woodward concern two separate, albeit related, aspects of the police response: First, the tactics employed by the officers at the scene during the confrontation with Lucilla and, second, the actual shooting. Respondents claimed that Woodward was negligent both because of the manner in which he supervised the police response at the scene, and because he was the one who applied deadly force against Lucilla.

The parties have diametrically opposed views as to the applicability of our *Adams* precedent to the facts of this case. Appellants argue for an expansive application by claiming no tort duty was owed to respondents, even where law enforcement use deadly force in the course of responding to a public safety emergency. On the other hand, respondents contend that *Adams* should be limited to its facts—that is, no duty of care is owed where police, in responding to an emergency call, fail to prevent a suicide. Both views are incorrect. As will be explained, this court's decision in *Adams, supra,* 68 Cal.App.4th 243, precludes liability based upon when and how law enforcement personnel respond to requests for emergency assistance from the public. Nevertheless, law enforcement officers do have a duty to refrain from unreasonable use of deadly force.

■ In *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561], the court identified a number of elements to be assessed in deciding whether a defendant owed a tort duty to a plaintiff. "These factors include: (1) the foreseeability of harm to the injured party; (2) the degree of certainty that the injured party suffered harm; (3) the closeness of the connection between the defendant's conduct and the injury suffered; (4) the moral blame attached to the defendant's conduct; (5) the policy of preventing future harm; (6) the extent of the burden to the defendant; and (7) the consequences to the community of imposing a duty to exercise care, with resulting potential liability. (*Rowland, supra,* 69 Cal.2d at pp. 112–113.)

Where a public entity is involved, the court considers the following additional factors: the availability, cost, and prevalence of insurance for the risk involved; the extent of the agency's powers; the role imposed on it by law; and the limitations imposed on it by budget. (*Thompson v. County of Alameda* (1980) 27 Cal.3d 741, 750 [167 Cal.Rptr. 70, 614 P.2d 728]; *Dutton* [*v. City of Pacifica* (1995)] 35 Cal.App.4th [1171,] 1175 [41 Cal.Rptr.2d 816]; *Allen* [*v. Toten* (1985)] 172 Cal.App.3d [1079,] 1086–1087 [218 Cal.Rptr. 725].)" (*Adams, supra,* 68 Cal.App.4th at pp. 267–268.) "[W]hen addressing conduct on the part of a defendant that is 'deliberative, and . . . undertaken to promote a chosen goal, . . . [c]hief among the factors which must be considered is the social value of the interest which the actor is seeking to advance.' [Citations.]" (*Parsons, supra,* 15 Cal.4th at p. 473, italics omitted.)

We considered these factors in *Adams,* in which the majority concluded that the police owed no duty of care toward a man killed during a crisis situation. The decedent in *Adams* had a history of depression, had been suicidal in the past, and became belligerent and argumentative when he drank hard liquor. After an argument with his wife in which the decedent broke dishes and pushed his wife, relatives found he had broken various items in the house and isolated himself in a dark closet. He responded to his stepdaughter's attempts to talk to him by discharging a firearm, causing his relatives concern that he might have injured himself. The relatives left the house and called the police, who eventually found the decedent sitting in the bushes in the backyard, wearing only underwear and cradling a gun pointed at his own chest. The police, who had weapons drawn and a police dog that had approached the decedent in the bushes, made various attempts to talk with the decedent, while the decedent continually told the police to leave. Some 16 minutes after the police had located the decedent in the yard, he told the police he could make them leave and gunfire erupted from the bush area. Believing the decedent had shot at them, the police fired at him. The self-inflicted shot from the decedent's gun proved fatal.

As in the present case, the expert testimony in *Adams* was conflicting as to whether the police officers' conduct at the scene fell below the standard of care. As here, Reedy testified as an expert for the plaintiffs that the police response was too rushed and confrontational, and that the police did not follow proper guidelines for crisis management. Additionally, a psychiatrist testified that the police were a substantial cause of the suicide. The defense law enforcement experts testified that the steps taken by the police were proper and disagreed with the plaintiffs' psychiatrist's opinion.

*Adams* focused on the tactical choices made by the police because the plaintiffs based their claims on this facet of the response. In balancing the *Rowland* factors, the majority justifiably placed importance on the public policy implications inherent in the analysis. (See *Parsons, supra,* 15 Cal.4th at p. 472.) For example, in discussing the *Rowland* factor of moral blame, we noted that "[p]olice officers often act and react in the milieu of criminal activity where every decision is fraught with uncertainty. [Citation.]" (*Adams, supra,* 68 Cal.App.4th at p. 270.) We went on to comment further, "[w]e agree with the *Allen* [*v. Totten, supra,* 172 Cal.App.3d 1079] court's conclusion that police officers providing assistance at the scene of a threatened suicide must concern themselves with more than simply the safety of the suicidal person. Protection of the physical safety of the police officers and other third parties is paramount. [Citation.]" (*Adams, supra,* 68 Cal.App.4th at p. 271, fn. omitted.)

These practical concerns compelled us to observe how imposing a duty of care would actually threaten, and not promote, public safety: "Moreover, at a minimum, imposition of a tort duty on public safety officers engaged in disarming suicidal persons is certainly likely to result in a more tentative police response to such crises. A suicide crisis involving a loaded firearm is an unstable situation in which the police must be free to make split-second decisions based on the immediacy of the moment. Knowledge that any unsuccessful attempt at intervention will be subjected to second-guessing by experts with the 20/20 vision of hindsight years following the crisis is likely to deter the police from taking decisive action to protect themselves and third parties. [Citations.] . . . Certainly, the risk of inhibiting law enforcement intervention necessary for the preservation of community welfare and peace outweighs the importance of ensuring nonnegligent treatment of persons threatening suicide—a consideration we readily acknowledge and which is only minimized by its comparison to the greater public interest.

"Furthermore, exposing police officers to tort liability for inadequate or unreasonable assistance to suicidal individuals could inhibit them from providing intervention at all. The resulting loss of an important resource in dealing with threatened suicides would be devastating to such affected communities." (*Adams, supra,* 68 Cal.App.4th at pp. 272–273, fn. omitted.)

Finally, in balancing the *Rowland* factors we were led to the inexorable conclusion that a tort duty could not be imposed: "On balance, the relevant public policy considerations militate against imposing a legal duty on police officers to take reasonable steps to prevent a threatened suicide from being carried out. The foreseeability and certainty of harm suffered are factors that

favor imposing a duty. The absence of moral blame, the remoteness of the connection between the conduct of appellants and the harm suffered, the policy of preventing future harm, consequences to the community, the role of law enforcement in society, and the potential detriment to the public in imposing judicial allocation of resources all heavily favor shielding law enforcement personnel from tort liability in instances such as this.

"Moreover, the majority of the disputed conduct in this case was the product of [the officer]'s deliberate tactical decisions designed to maximize the safety of the responding officers. Therefore, under *Parsons*, *supra*, 15 Cal.4th at page 472, we must also consider the social value of the interest [the officer] sought to advance. (*Ibid.*) The social value of protecting the lives of police officers involved in a standoff with an armed individual is extremely high. Accordingly, after balancing the relevant considerations, we conclude that appellants owed respondents no duty of care under this analysis." (*Adams*, *supra*, 68 Cal.App.4th at p. 276.)

The reasoning the majority employed in *Adams* applies with equal force to cases such as this one where police conduct fails to prevent harm. Like the critique he made of police in *Adams*, respondents' expert Reedy offered the opinion that the strategy Woodward employed was unreasonable in a number of ways. These included failing to set up a perimeter to contain the situation, getting too close to Lucilla, getting personally involved rather than maintaining his role as supervisor, failing to take the time to confirm facts through relatives and neighbors, failing to use a hostage negotiator, failing to establish real communication with Lucilla or to communicate with dispatch or Benetez, and having a weapon drawn while taking with Lucilla.

But like *Adams,* the need to protect the overall safety of the community by encouraging law enforcement officers to exercise their best judgment in deciding how to deal with public safety emergencies vastly outweighs the societal value of imposing tort liability for the judgments they make in emergency situations. *Adams* stands for the proposition that law enforcement officers are shielded from ordinary negligence claims based on their response to public safety emergencies when those efforts prove to be ineffective in preventing self-inflicted harm or harm caused by third parties. Applied to the present case, *Adams* means that the conduct of the police—Woodward's decisions as to how to deploy his officers at the scene, the efforts made in an attempt to defuse the situation as safely as possible, and other such factors—cannot subject appellants to liability. For these reasons, finding a tort duty

and submitting to the jury the question of whether police decisions fell below the standard of care, was error.[4]

As in *Adams*, we are not indifferent to respondents' concern that insulating law enforcement emergency actions from tort liability poses the question of whether such a shield will discourage police from overzealous conduct. Indeed, this concern is likewise noted in the concurring opinion in this case, which complains, "*Adams* [and this decision, by implication] frees the police to employ outrageously dangerous tactics." (Conc. opn. of Kline, P. J., *post*, at p. 1118.) In this regard, we find the response we made in *Adams* equally applicable here: "Yet, respondents correctly point out that not imposing a legal duty on police officers to take reasonable measures to prevent a threatened suicide correspondingly diminishes the benefits to the public gained by requiring law enforcement personnel to be accountable for their unreasonable conduct. While this is so to some extent, we conclude on balance the interests to the public in protecting against future harm and the detrimental consequences to the public in imposing a tort duty under such circumstances, outweigh the partial loss of legal accountability occasioned by a rule of nonliability. Moreover, our decision does not insulate police misconduct from all legal and internal scrutiny. Plaintiffs may still pursue a legal action when police misconduct constitutes an intentional tort or a violation of an individual's constitutional or other federally protected rights. (42 U.S.C. § 1983.) Furthermore, citizens may obtain internal review of police conduct by filing a citizen complaint (Pen. Code, § 832.5), and police officers may be sanctioned as a result of internal disciplinary proceedings. (See *Warren v. District of Columbia* (D.C.App. 1981) 444 A.2d 1, 8 . . . .) The existence of these other avenues for redress undercuts the need for additionally imposing tort liability to deter police officers from responding to a threatened suicide in an unreasonable manner." (*Adams*, *supra*, 68 Cal.App.4th at p. 274.)

The concurring opinion also exhumes its view in the *Adams* dissent that a tort duty should be imposed here under the rescuer theory, or special relationship doctrine, suggested by section 343 of the Restatement Second of Torts. We need not repeat the dialogue we exchanged with the dissent in *Adams* on this alternative tort theory for the simple reason that no contention was made by respondents in this case, either in the trial court or on appeal,

---

[4] We conclude, *post*, at page 1101 that the error was harmless in light of the jury's determination of liability based on the appellants' use of deadly force. Also, because we conclude the trial court erred in allowing the jury to consider the pre-shooting tactical decisions of the police in determining appellants' liability, we need not decide whether there was sufficient evidence to support the jury's finding of proximate cause. In doing so, we observe that the nexus needed to establish a causal link under a *Rowland* analysis is different from a factual determination of proximate cause. (*Adams*, *supra*, 68 Cal.App.4th at p. 269.)

that appellants' liability was premised on the special relationship doctrine. Indeed, respondents' brief cites neither *Williams v. State of California* (1983) 34 Cal.3d 18 [192 Cal.Rptr. 233, 664 P.2d 137], nor *Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703 [110 Cal.Rptr.2d 528, 28 P.3d 249] (*Lugtu*), the two cases our concurring colleague principally relies upon in seeking its application to the inapposite facts of this case.[5]

█ But our analysis does not end with our discussion of the meaning of *Adams*, for *Adams* presented a more limited claim than that being made in this case. Here, the focus is not simply on the failure of police to prevent harm, but police conduct that directly inflicted harm. *Adams* does not go so far as to insulate officers in crisis situations from liability for their own unreasonable use of deadly force. Indeed, we expressly recognized in *Adams* that reckless and unreasonable use of deadly force by the police would be subject to tort liability: "We agree with appellants that the harm suffered by Patrick is most appropriately characterized as suicide. Respondents contend the jury was free to infer that Patrick did not die from self-inflicted injuries because the possibility existed that Patrick shot himself reflexively after police officers fired the first shots. Below, the trial court repeatedly rejected this argument, concluding that to permit the jury to 'speculate and suppose that the gunfire originated with the police, is not something I can accept. There is no evidence presented to the jury or to me that the officers fired first.' We agree that no evidence was introduced from which a reasonable jury could conclude that the police officers fired first. . . . If the factual record supported the dissent's conclusion that in the absence of any threatening behavior, officers recklessly 'killed' Patrick by 'riddl[ing]' his body with a 'hail of bullets,' we certainly would agree that the officers were properly subjected to tort liability. (Dis. opn., *post*, at p. 307.)" (*Adams, supra,* 68 Cal.App.4th at p. 262, fn. 16.)

█ Twenty-eight years earlier our Supreme Court determined that police officers have a duty to use reasonable care in employing deadly force. In *Grudt v. City of Los Angeles* (1970) 2 Cal.3d 575 [86 Cal.Rptr. 465, 468 P.2d 825] (*Grudt*), Grudt, who was slightly hard of hearing, was driving in a high

---

[5] As explained in *Lugtu*, the special relationship doctrine was applicable there because the risk of harm was *created* by the manner in which the highway patrol made traffic stops in that case. (*Lugtu, supra,* 26 Cal.4th at pp. 716–717.) This is far different from instances where liability is sought to be imposed based on the manner in which law enforcement respond to a public safety emergency involving a preexisting risk of harm. (*Ibid.*) The third case cited in the concurring opinion, *Benavidez v. San Jose Police Dept.* (1999) 71 Cal.App.4th 853 [84 Cal.Rptr.2d 157], affirmed a summary judgment after concluding that the facts in that case were insufficient to create a special relationship between the crime victim and police. (*Id.* at p. 868.)

crime area when plainclothes police officers in an unmarked vehicle unsuccessfully attempted to stop him and observed him reach under the front seat of the car. Two other plainclothes officers who had heard a broadcast about the pursuit intercepted Grudt at an intersection and one of them tapped loudly on Grudt's window with a loaded shotgun. According to the officer, he shot Grudt when Grudt suddenly accelerated, brushed past one officer and struck the other in the leg; according to other evidence, Grudt's car had not moved at the time the shots were fired. Grudt died within seconds. At the time of the shooting, marked police vehicles were converging on the intersection from north and south. Grudt's wallet was found under the seat of the car. (*Id.* at pp. 581–582.)

The *Grudt* court found the trial court erred in removing the issue of negligence from the jury, as the evidence most favorable to the plaintiff could have supported a view that Grudt, driving in a high crime area late at night and hailed to stop by men in plain clothes, thought he was going to be robbed, tried to elude the robbers, hid his wallet under his seat and was shot when his car stopped at an intersection. Questions of negligence were presented by the officers' decisions to arrest Grudt without waiting for uniformed officers to arrive, to tap on the window with a shotgun, and to use deadly force. "At the very least, the evidence favorable to plaintiff raised a reasonable doubt whether [the officers] acted in a manner consistent with their duty of due care when they originally decided to apprehend Grudt, when they approached his vehicle with drawn weapons, and when they shot him to death." (*Grudt, supra,* 2 Cal.3d at p. 587.)

Similarly, in *Munoz v. Olin* (1979) 24 Cal.3d 629 [156 Cal.Rptr. 727, 596 P.2d 1143], police officers investigating arson incidents in Munoz's neighborhood shot Munoz in the belief he was the person they had seen igniting a fire by a local business. The court stated, "Defendants do not dispute that an officer's lack of due care can give rise to negligence liability for the intentional shooting death of a suspect. In *Grudt*[*, supra,*] 2 Cal.3d 575 [86 Cal.Rptr. 465, 468 P.2d 825] . . . this court expressly so held." (*Munoz v. Olin, supra,* 24 Cal.3d at p. 634.) The *Munoz* court went on to find substantial evidence to support the jury's finding of negligence in that defense evidence suggested Munoz was innocently on his way home, the officers were mistaken in their determination he was the arsonist they had seen, and the officers failed to warn Munoz or attempt to apprehend him by other means. (*Id.* at pp. 635–637.)

Appellants argue that neither *Grudt* nor *Munoz* actually analyzed the duty issue or involved a crisis situation such as in the present case. This much is true. The issue in *Grudt* was whether the plaintiffs could proceed on a negligence theory where they had pled only an intentional tort but the pretrial

conference order raised negligence as an issue to be tried; *Grudt* permitted the plaintiffs to proceed on inconsistent theories of liability. In *Munoz*, the parties did not dispute the issue of duty. Hence, these cases assumed the existence of a duty to use reasonable care in apprehending a suspect. As appellants note, the factual situations in these cases were quite different from the crisis situation presented here. Nevertheless, *Grudt* and *Munoz* do implicitly recognize a duty on the part of police officers to use reasonable care in deciding to use and in fact using deadly force. (See also *Davis v. City of Sacramento* (1994) 24 Cal.App.4th 393, 404–406 [29 Cal.Rptr.2d 232] [upholding jury verdict of no negligence in police shooting of man during investigation of domestic disturbance; issue in dispute was whether officer used reasonable care, with no discussion of duty].) Indeed, the assumption that such a duty exists was critical to the decisions, as the plaintiffs otherwise could not have been permitted to establish liability based on negligence. The court's implicit determination that police officers owe a duty of care not to use deadly force unreasonably can only have been based on recognition that consideration of the *Rowland* factors would support finding such a duty. So, here, appellants had a duty to use reasonable care in employing deadly force.

Given the preceding discussion, if the jury's verdict was based on the theory of liability against Woodward that we reject (pre-shooting response at the scene) and was not based on the use of deadly force, we would be compelled to reverse and remand for retrial. However, in context it is apparent that the jury's consideration of Woodward's pre-shooting activity does not undermine the verdict. As we discuss below, the jury found that Lucilla's death was caused by Woodward's battery upon her—the unreasonable use of deadly force—and this finding is fully supported by the evidence. Based on this finding, the jury also must have concluded that the use of deadly force was negligent, a legal theory we also find legally and factually sustainable. Because one of the theories of liability against Woodward is factually and legally sustained, the jury's consideration of the circumstances giving rise to the shooting was necessarily harmless. (*Widson v. International Harvester Co.* (1984) 153 Cal.App.3d 45, 54 [200 Cal.Rptr. 136] ["Reversal is not required where there is another independent basis to support a verdict."]; see also, *Bresnahan v. Chrysler Corp.* (1998) 65 Cal.App.4th 1149, 1153 [76 Cal.Rptr.2d 804].)

B. *Substantial Evidence of Woodward's Unreasonable Use of Deadly Force*

Appellants argue they cannot be held liable for Woodward's use of deadly force because no reasonable jury could conclude the use of such force was unreasonable. In reviewing a claim of insufficiency of the evidence a reviewing court must examine the entire record in the light most favorable to

the respondent, resolving all evidentiary conflicts and making all reasonable inferences in support of the judgment. (*Stenseth v. Wells Fargo Bank* (1995) 41 Cal.App.4th 457, 464 [48 Cal.Rptr.2d 192].)

■ In order to prevail on a claim of battery against a police officer, the plaintiff bears the burden of proving the officer used unreasonable force. (*Edson v. City of Anaheim* (1998) 63 Cal.App.4th 1269, 1272 [74 Cal.Rptr.2d 614] (*Edson*).) "A police officer in California may use reasonable force to make an arrest, prevent escape or overcome resistance, and need not desist in the face of resistance. (Pen. Code, § 835a.) The standard jury instruction in police battery actions recognizes this: 'A peace officer who uses unreasonable or excessive force in making a lawful arrest or detention commits a battery upon the person being arrested or detained as to such excessive force.' (BAJI No. 7.54.)" (*Edson, supra*, 63 Cal.App.4th at pp. 1272–1273, fns. omitted.)

■ Claims that police officers used excessive force in the course of an arrest, investigatory stop or other "seizure" of a free citizen are analyzed under the reasonableness standard of the Fourth Amendment to the United States Constitution. (*Graham v. Connor* (1989) 490 U.S. 386, 395 [104 L.Ed.2d 443, 109 S.Ct. 1865].)[6] "The test of reasonableness in this context is an objective one, viewed from the vantage of a reasonable officer on the scene. It is also highly deferential to the police officer's need to protect himself and others: 'The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. [Citation.] . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation. [¶] [T]he "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. [Citations.]' (*Graham [v. Connor], supra*, 490 U.S. at pp. 396–397 . . . .)

" '. . . Thus, under *Graham*, we must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different

---

[6] Federal civil rights claims of excessive force are the federal counterpart to state battery and wrongful death claims; in both, the plaintiff must prove the unreasonableness of the officer's conduct. (*Edson, supra*, 63 Cal.App.4th at p. 1274; *Susag v. City of Lake Forest* (2002) 94 Cal.App.4th 1401, 1412–1413 [115 Cal.Rptr.2d 269].) Accordingly, federal cases are instructive.

to someone facing a possible assailant than to someone analyzing the question at leisure.' (*Smith v. Freland* (6th Cir. 1992) 954 F.2d 343, 347.)

"The Supreme Court's definition of reasonableness is therefore 'comparatively generous to the police in cases where potential danger, emergency conditions or other exigent circumstances are present.' (*Roy v. Inhabitants of City of Lewiston* (1st Cir. 1994) 42 F.3d 691, 695 . . . .) In effect, 'the Supreme Court intends to surround the police who make these on-the-spot choices in dangerous situations with a fairly wide zone of protection in close cases. . . .' (*Ibid.*)" (*Martinez v. County of Los Angeles* (1996) 47 Cal.App.4th 334, 343–344 [54 Cal.Rptr.2d 772] (*Martinez*).) "An officer's use of deadly force is reasonable only if 'the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others.' [(]*Tennessee v. Garner* [(1985)] 471 U.S. 1, 3 [85 L.Ed.2d 1, 105 S.Ct. 1694] . . . ; see also *Graham* [*v. Connor, supra,*] 490 U.S. at [p.] 396 one of factors in determining reasonableness is 'whether the suspect poses an immediate threat to the safety of the officers or others').[']" (*Scott v. Henrich* (9th Cir. 1994) 39 F.3d 912, 914, italics omitted; *Reynolds v. County of San Diego* (9th Cir. 1996) 84 F.3d 1162, 1167, overruled on other grounds in *Acri v. Varian Associates, Inc.* (9th Cir. 1997) 109 F.3d 1375; *Martinez, supra*, 47 Cal.App.4th at p. 345.) "Thus, 'an officer may reasonably use deadly force when he or she confronts an armed suspect in close proximity whose actions indicate an intent to attack.' " (*Martinez, supra*, 47 Cal.App.4th at p. 345, quoting *Reynolds v. County of San Diego* (S.D.Cal. 1994) 858 F.Supp. 1064, 1072.)

Respondents presented substantial evidence justifying the jury's determination that the use of deadly force by Woodward was unreasonable. For example, Woodward testified that he shot Lucilla because he believed she had a gun and was going to kill at least her father. Respondents presented evidence, however, that Woodward should have known Lucilla in fact held two knives (leaving no room in her hands for a gun) because the initial police dispatch so reported and various individuals whom Woodward could have contacted directly or through the dispatcher (Jessie, J.J. and Yvette) knew Lucilla held two knives. Woodward himself had testified in a deposition that at the time he arrived at Lucilla's house he had heard the dispatcher confirm that Lucilla was in possession of one knife. Woodward acknowledged, however, that the tape of the dispatch, which he had subsequently reviewed, in fact stated she had two knives. Woodward testified at trial that he did not hear the broadcast of the dispatcher's confirmation because his radio was malfunctioning, but that Kruger told him its substance.[7]

---

[7] Kruger testified that he recalled the dispatcher saying the suspect had one knife, but acknowledged that the dispatch tape documented her saying it was two knives. Housley told

There was also evidence that Woodward made statements indicating he realized Lucilla had two knives. Jessie said the second officer told Lucilla to "drop the knives and talk to him." Yvette answered in the affirmative the question whether she heard the police "ask [Lucilla] to put the knives down." J.J. heard Woodward tell Lucilla, " 'put the knives down so I can come in to talk to you.' "

Additionally, while Woodward and the other officers testified they could not see Lucilla's right hand because it was concealed behind the latch plate on the screen door, the credibility of this testimony was undermined by the same witnesses' descriptions of Lucilla's agitated state. Respondents' forensic expert John Thornton testified that, given Lucilla's short stature, when standing with her back close to the open front door, her right arm would not have been long enough to reach the 30 inches to the beginning of the latch plate. Based on an experiment conducted with a coworker who was one inch taller than Lucilla, Thornton opined that the knife in Lucilla's right hand would have been visible to anyone standing within five or 10 feet of the door. Defense expert George Williams testified that "someone who was in an agitated state such as [Lucilla] was it would not likely be possible for her to hold her hand in any one position for any extended period of time." Kruger testified that Lucilla waved both her hands around and there was nothing preventing him from seeing both of her hands. Housley testified that Lucilla was "throwing her body around vigorously and rapidly," although he also testified he was not able to see her right hand because it was concealed behind the latch plate on the screen door. Jessie testified that he never saw Lucilla conceal her hands or hold her hand behind the latch plate.

The evidence also showed that Woodward and the other officers maintained positions that would have been directly in the line of fire if Lucilla had been armed with a gun, contrary to their training, permitting the jury to infer that the officers did not actually think she had a gun.

Finally, there was evidence from which the jury could have inferred that Woodward was not reasonable in believing that Lucilla posed an immediate threat to her father and daughter: J.J.'s initial report to the police expressed concern for Lucilla herself but no concern that she might hurt anyone else, and no witness other than Woodward heard Lucilla make any threat directed at her relatives. Several witnesses testified they did not hear Lucilla threaten anyone. Woodward testified that he never heard Lucilla threaten Yvette, and that the initial dispatch concerning the situation did not refer to threats to

Bizieff after the incident that he had heard the dispatcher say Lucilla was in possession of two knives.

family members. Reedy testified that all of the witnesses other than Woodward stated that Lucilla made no threats. This evidence was ample to support a finding of unreasonable force.

The cases relied upon by appellants to support a contrary conclusion are distinguishable. In *Martinez*, police officers who had just arrested and handcuffed two juveniles for spray-painting graffiti on a store were faced with a man holding a carving knife with an eight-inch blade in positions ranging from "waist high with the blade pointed skyward to by his head above his shoulders." (*Martinez, supra*, 47 Cal.App.4th at p. 340.) The man walked toward the officers in a "slow, stiff, rigid, deliberate, lethargic and mechanical" manner, apparently oblivious to the traffic through which he walked. (*Id.* at p. 339.) The officers believed he was under the influence of PCP and knew that a person taking PCP can have extraordinary strength and a high pain tolerance. The officers drew pistols and told the man to stop and drop the knife; he continued to advance, shouting, " ' "Go ahead, kill me or I'm going to kill you" ' and ' "Shoot me. Shoot me." ' " (*Id.* at p. 340.) Although the officers repeatedly retreated and told the man to drop the knife, he continued toward them, appearing to one witness as though he wanted to stab them. When he came within about 10 to 15 feet of the officers (and juveniles they had handcuffed), the officers shot him. (*Ibid.*) *Martinez* concluded the shooting was objectively reasonable because the man continued to advance despite repeated warnings to stop and stated his intention to kill the officers.[8]

In *Reynolds v. County of San Diego, supra*, 84 F.3d 1162, a man at a gas station who was holding a knife and was reported to have been acting strangely confronted a police officer. The officer drew his gun, ordered Reynolds to stop and put his hands in the air and Reynolds complied. He further complied with a direction to get on the ground and, told to drop the knife, placed the knife on the ground next to him. As the officer slowly approached, telling Reynolds not to move, Reynolds suddenly sat up and grabbed the knife. The officer continued to approach, placed his knee in Reynolds's back and his gun on Reynolds's neck, and ordered Reynolds to

---

[8] *Martinez* was decided as a summary judgment. The complaint in that case stated causes of action for violation of civil rights (42 U.S.C. § 1983) and wrongful death. The federal causes of action were held to be barred by the officers' qualified immunity, because the use of deadly force was reasonable. (*Martinez, supra*, 47 Cal.App.4th at p. 344.) The state wrongful death claim was held to be barred because, since the officers acted reasonably in shooting the man, the homicide was justifiable. Under Penal Code section 196, a homicide committed by a police officer is justifiable if it was " 'necessarily committed in overcoming actual resistance to the execution of some legal process, or in the discharge of any other legal duty' . . ." (47 Cal.App.4th at p. 349.) "There can be no civil liability under California law as the result of a justifiable homicide. [Citations.]" (47 Cal.App.4th at p. 349.) Because the homicide was justifiable, the officers were also immune under Government Code section 820.2. (47 Cal.App.4th at p. 349.) It is interesting to note that although appellants in the present case rely heavily on *Martinez*, they did not seek summary judgment on similar grounds.

drop the knife. Reynolds "twisted his body and made a sudden, backhanded, upward swing toward Jackson with his right hand which was holding the knife." The officer shot and killed him. (*Id.* at p. 1165.) The *Reynolds* court found the use of deadly force reasonable because "[b]y suddenly swinging at [the officer] with the knife, Reynolds threatened [the officer's] life or at least put him in fear of great bodily injury." (*Id.* at p. 1168.) The court rejected expert testimony that Reynolds moved because of the pressure of the officer's gun on his neck as speculation and stated that expert opinion that the officer should have used alternative methods to restrain Reynolds did not raise a triable fact as to the reasonableness of the conduct. (*Id.* at p. 1169.)

■ Here, although Lucilla was armed with two knives, she was not using them to threaten her relatives in the house. Jessie testified that Lucilla was pointing the knives at the door behind her and stabbing the door with them. Woodward was the only witness who claimed to hear any verbal threat directed at Jessie or Yvette. Lucilla was unquestionably agitated and acting erratically, but she remained in the same place, at the door of the house, throughout the incident. While several witnesses heard her statement that she was going to come out at the officers in "full force," she never in fact made a move to do so. The movement that precipitated Woodward's shots was a six-inch movement in the direction Jessie and Yvette had gone. On this evidence, the jury could reasonably conclude that Lucilla's actions did not " 'indicate an intent to attack' " (*Martinez, supra,* 47 Cal.App.4th at p. 345), and Woodward did not have probable cause to believe Lucilla posed a "significant threat of death or serious physical injury to the officer[s] or others." (*Tennessee v. Garner, supra,* 471 U.S. at p. 3; *Reynolds v. County of San Diego, supra,* 84 F.3d at p. 1167; *Scott v. Henrich, supra,* 39 F.3d at p. 914.)

Appellants argue that there were no reasonable alternatives to use of deadly force, urging that it was speculative to assume the various alternatives suggested in Reedy's testimony (evacuating Jessie and Yvette through the rear of the house, entering through the rear door or forcibly opening the front door) would have changed the ultimate result of Lucilla being shot. We do not find it necessary to resolve whether Reedy's testimony presented evidence of viable alternative resolutions of this crisis situation. The question before us is whether a reasonable jury could have concluded that the evidence proved Woodward's use of deadly force was unreasonable. The reasonableness of Woodward's use of deadly force is judged by assessment of the facts and circumstances to determine whether Woodward had "probable cause to believe that the suspect pose[d] a significant threat of death or serious physical injury to the officer or others." (*Tennessee v. Garner, supra,* 471 U.S. at p. 3; *Scott v. Henrich, supra,* 39 F.3d at p. 914; *Reynolds v. County of San Diego, supra,* 84 F.3d at p. 1167.) Since there was substantial evidence from which the jury could conclude he did not, appellants' challenge must fail.

## C. Alleged Erroneous Rejection of Defense Jury Instruction On Unreasonable Force

Appellants alternatively urge reversal due to the trial court's refusal of a proposed jury instruction defining "reasonableness" for purposes of this claim.

The trial court refused to give the following jury instruction proposed by appellants: "In determining whether or not reasonable force was used, you must consider the degree of force which a reasonable officer on the scene at the time would have applied under the circumstances shown from the evidence in this case. [¶] The test of reasonableness is not one of 20/20 hind sight, but one that necessarily allows for the fact that peace officers are often forced to make split-second decisions in circumstances that are tense, uncertain and rapidly evolving about the amount of force that is necessary in a particular situation. [¶] (*Fikes v. Cleghorn* (9th Cir. 199[5]) 47 F.3d 1011, 1013; *Graham v. Connor* (1989) 490 U.S. 386, 396–397 [104 L.Ed.2d 443, 109 S.Ct. 1865] . . . .)"

The jury was instructed that a police officer may use "reasonable force" to make a detention, prevent escape or overcome resistance and that an officer "who uses unreasonable or excessive force in making a detention commits a battery upon the person being detained." (BAJI No. 7.54 (1997 rev.).) The jury was further instructed: "A police officer may use deadly force to detain only if he has a reasonable belief there is an immediate risk that the person whose detention is sought will cause death or serious bodily harm. [¶] If you find that the defendant Tod Woodward did not have a reasonable belief that Lucilla Amaya posed an immediate risk of death or serious bodily harm to her father or daughter, you will find that his use of deadly force was unreasonable. [¶] If you find that the defendant Tod Woodward did have a reasonable belief that Lucilla Amaya posed an immediate risk of death or serious bodily harm to her father or daughter you will find his use of deadly force reasonable." Appellants complain that these instructions did not inform the jury that the test for reasonableness is an *objective* one and therefore permitted the jury to accept what appellants refer to as Reedy's "subjective, after-the-fact, perfect hindsight 'opinions' regarding the reasonableness of Woodward's use of force."

" ' "Parties have the 'right to have the jury instructed as to the law applicable to all their theories of the case which were supported by the pleadings and the evidence, whether or not that evidence was considered persuasive by the trial court.' [Citation.] 'A reviewing court must review the

evidence most favorable to the contention that the requested instruction is applicable since the parties are entitled to an instruction thereon if the evidence so viewed could establish the elements of the theory presented. [Citation.]' [Citation.]" (*Maxwell v. Powers* (1994) 22 Cal.App.4th 1596, 1607 [28 Cal.Rptr.2d 62].)' (*Logacz v. Limansky* [(1999)] 71 Cal.App.4th 1149, 1157 [84 Cal.Rptr.2d 257].)" (*Galvez v. Frields* (2001) 88 Cal.App.4th 1410, 1420 [107 Cal.Rptr.2d 50].)

 However, the requesting party's right is to *nonargumentative* instructions. (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 [34 Cal.Rptr.2d 607, 882 P.2d 298]; *McMahon v. Albany Unified School Dist.* (2002) 104 Cal.App.4th 1275, 1289 [129 Cal.Rptr.2d 184].) "The court should state rules of law in general terms, and avoid reciting matters of evidence. If the instruction embodies detailed recitals of fact drawn from the evidence, in such a manner as to constitute an argument to the jury in the guise of a statement of the law, it is improper. The matter may be entirely legitimate as argument by counsel, for when so used, the jury knows that it comes from an interested source and may weigh and consider it accordingly. But it is seriously objectionable to have the same matter injected into the court's charge, which, as the jurors are informed, is binding upon them. [Citations.]" (7 Witkin, Cal. Procedure (4th ed. 1997) Trial, § 323, pp. 366–367.) Additionally, "it is error to give, and proper to refuse, instructions that unduly overemphasize issues, theories or defenses either by repetition or singling them out or making them unduly prominent although the instruction may be a legal proposition. [Citations.]" (*Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 718 [39 Cal.Rptr. 64].) The proposed instruction in the present case was properly viewed by the court as argumentative. As the trial court stated, the instruction "highlights one side in terms of the 20/20 hindsight."

By instructing the jury to determine whether Woodward acted reasonably in using deadly force, the court properly directed use of an objective standard. As the instructions on negligence expressly stated, the reasonableness standard refers to a person—in this case, a police officer—of "reasonable and ordinary prudence," not one "extraordinarily cautious" or "exceptionally skillful."

 Appellants are correct, as is evident from our discussion in part IV of this opinion, that police officers are given more deference in judging the reasonableness of use of force than a private citizen would be. (*Graham v. Connor, supra,* 490 U.S. at pp. 396–397; *Edson, supra,* 63 Cal.App.4th at p. 1273; *Martinez, supra,* 47 Cal.App.4th at p. 344.) As explained in *Edson,* however, this special situation of a police defendant is taken into account by the rule imposing upon a plaintiff the burden of proving a police defendant

used unreasonable force. (*Edson, supra,* 63 Cal.App.4th at p. 1273.) "Unlike private citizens, police officers act under color of law to protect the public interest. They are charged with acting affirmatively and using force as part of their duties, because 'the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.' (*Graham v. Connor*[, *supra,*] 490 U.S. 386, 396 [104 L.Ed.2d 443, 109 S.Ct. 1865] . . . .) They are, in short, not similarly situated to the ordinary battery defendant and need not be treated the same. In these cases, then, '. . . the defendant police officer is in the exercise of the privilege of protecting the public peace and order [and] he is entitled to the even greater use of force than might be in the same circumstances required for self-defense. [¶] . . . [¶] . . . [T]he burden of proof [is] upon the plaintiff to establish the use of excessive force . . . .' (*Wirsing v. Krzeminski* [(Wis. 1973)] 61 Wis.2d 513 [213 N.W.2d 37, 41].)

"Equally important, a police officer must have control over the manner and means of making an arrest or detention. The interests of the commonweal happily coincide here with sound logic. Both dictate that '[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.' (*Graham v. Connor, supra,* 490 U.S. at pp. 396–397 . . . .) Placing the burden of proof on the plaintiff gives the police appropriate maneuvering room in which to make such judgments free from the need to justify every action in a court of law." (*Edson, supra,* 63 Cal.App.4th at pp. 1273–1274.)

██ The proposed jury instruction was not necessary for the jury to properly evaluate the reasonableness of Woodward's conduct. It was argumentative because it attempted to draw the jury's attention to particular aspects of the evidence rather than generally stating a principle of law for the jury to apply to the facts. Accordingly, it was properly refused.

We are more sympathetic to appellants' complaint that the trial court erroneously directed the jury to disregard defense counsel's recitation in closing argument of the rejected instruction. Defense counsel quoted from the rejected instruction, stating at the end, "Boy, does that sum this case up." Subsequently, the court admonished the jury: "I have given you the instructions on the law and you will have these [in] your possession. As I have indicated, the attorneys' arguments in closing, while eloquent[,] are not evidence. As I have indicated to you they are theories of the case as reflected by their theory of what the evidence showed. If either Counsel has defined the law of reasonableness which is in conflict with any of the instructions that I have given, you are to disregard their commentary and to follow the law as

I have given it and I want to make clear that you understand that as to my jury instructions and as to their argument."

The quotation directing the jury that the test of reasonableness "is not one of 20/20 hindsight, but one which necessarily allows for the fact that police officers are often forced to make split-second decisions in circumstances that are tense, uncertain, and rapidly evolving with the amount of force which is necessary" was taken directly from case law (*Graham v. Connor, supra*, 490 U.S. at pp. 396–397) and is a correct statement of law. Although not appropriate as an instruction from the court, there was nothing wrong with these statements as part of closing argument. (See 7 Witkin, Cal. Procedure, *supra*, Trial, § 323, p. 366; *Fibreboard Paper Products Corp. v. East Bay Union of Machinists, supra*, 227 Cal.App.2d at p. 718.)

Nevertheless, we do not view the court's admonition as prejudicial error. The quotation at issue highlighted a theory of the defense that was repeatedly presented to the jury throughout the case—that police officers responding to crisis situations must work under stress, often with inadequate information, and must make decisions quickly as each situation evolves. The testimony of defense expert Williams made this theory abundantly clear. Even without the specific language of the quotation the court removed from the jury's consideration, it is inconceivable that the jury was not aware the defense was asking it to view this case from Woodward's perspective at the time, under the pressures of the crisis, rather than with the benefit of hindsight.

### D. Conclusion

The jury found Woodward to have been 50 percent at fault in the harm caused to respondents. The parties concede that, if the judgment as to Woodward is upheld on appeal, Union City is liable for that portion of the jury's award under the doctrine of vicarious liability. (Gov. Code, § 815.2, subd. (a); *Eastburn, supra*, 31 Cal.4th 1175, 1184–1185.) However, the jury also found Union City directly at fault for 45 percent of the harm. A recent significant decision by our Supreme Court clarifying the law of public entity tort liability requires that we examine this separate finding independently of Union City's vicarious liability for Woodward's conduct.

### V.

#### DIRECT NEGLIGENCE OF UNION CITY

Union City has taken the position both below and on appeal that the judgment must be reversed because it too owed no tort duty to respondents. After the original oral arguments, and while the case was under submission,

the above mentioned *Eastburn* decision was filed by the Supreme Court on December 18, 2003. In light of that decision, on January 7, 2004, the parties were asked to submit supplemental briefs on the question, inter alia, of what effect, if any, *Eastburn* has as to that portion of the jury's verdict against Union City premised on a theory of direct negligence. Once supplemental briefing was complete, the case was reargued at respondents' request on this single issue. As noted in our introduction to this opinion, we conclude that this portion of the jury's verdict must be reversed.

*Eastburn* was a tort action arising out of alleged negligence on the part of certain public entities responsible for providing " 'emergency dispatch services for 911 callers.' " (*Eastburn, supra,* 31 Cal.4th at p. 1179.) The complaint alleged direct negligence by the public agencies in the manner in which dispatchers were trained, the promulgation of guidelines for the handling of 911 calls, and the response to such calls. It was further alleged that the three-year-old plaintiff received injuries as a result of electric shock while bathing that were either caused or exacerbated by this negligence. (*Ibid.*) In framing the issue pertinent to us here, the Supreme Court noted:

"The California Tort Claims Act provides that '[a] public entity is not liable for an injury,' '[e]xcept as otherwise provided by statute.' (Gov. Code, § 815, subd. (a).) As that language indicates, the intent of the Tort Claims Act is to confine potential governmental liability, not expand it. (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1127 [119 Cal.Rptr.2d 709, 45 P.3d 1171] (*Zelig*).) We first must determine whether any statute imposes direct liability on defendant agencies here. At oral argument, plaintiffs' counsel suggested that Government Code section 820, subdivision (a), applied. But that section provides only that public employees are liable for injuries from their acts or omissions in the scope of their employment to the same extent as private persons, unless otherwise provided by statute. As we recently observed, no similar provision makes public agencies liable for their own negligent conduct or omission to the same extent as a private person or entity. (*Zelig, supra,* 27 Cal.4th at pp. 1127–1128.)

"Government Code section 815.6, makes a public entity directly liable for its breach of a statutory 'mandatory duty,' but with the exception of Health and Safety Code section 1799.107, discussed below, plaintiffs cite, and we have found, no statutory provision declaring or defining a public agency's duty of care with respect to handling 911 emergency calls. Civil Code section 1714 imposes a general duty of care on all persons but, as we explain below in connection with our discussion of *Ma v. City and County of San Francisco* (2002) 95 Cal.App.4th 488 [115 Cal.Rptr.2d 544] (*Ma*), section 1714 is an insufficient statutory basis for imposing direct liability on public agencies." (*Eastburn, supra,* 31 Cal.4th at pp. 1179–1180, italics omitted).

After reviewing the *Ma* decision,[9] among others, the court concluded that common law principles were insufficient to support a *direct* action in tort against a public entity. The unanimous opinion of the court noted with unmistakable clarity: "We think that *Ma* erred in concluding that Civil Code section 1714, and the common law principles it codified, were alone sufficient bases for imposing direct tort liability on a public entity. As previously noted, '[a] public entity is not liable for an injury,' '[e]xcept as otherwise provided by statute.' (Gov. Code, § 815.) In other words, direct tort liability of public entities must be based on a specific statute declaring them to be liable, or at least creating some specific duty of care, and not on the general tort provisions of Civil Code section 1714." (*Eastburn, supra,* 31 Cal.4th at p. 1183, italics omitted.)

The operative first amended complaint (FAC) filed below by respondents pleaded nine causes of action, and named as defendants only Union City, Union City Police Chief Al Guzman, and Corporal Woodward.[10] The first five claims focus on the alleged negligent acts or omissions of Woodward and his subordinates at the scene of the shooting. The sixth cause of action is directed against Union City and Chief Guzman, and, much like the claims at issue in *Eastburn,* alleges negligence in the selection, training, retention, supervision, and discipline of police officers as well as the failure to enact procedures and policies guiding law enforcement officers "in the handling of critical incidents." The seventh cause of action is titled "Respondeat Superior" and alleges that Union City bears legal responsibility for the conduct charged against Woodward *only,* pursuant to Government Code section 815.2, subdivision (a).[11] Thus, it is clear from respondents' pleading that at least two separate theories of liability were pursued against Union City: one under the doctrine of respondeat superior, or vicarious liability, for Woodward's actions at the scene, and one for direct liability for not having done more to prevent the confrontation from developing, either through the promulgation of clearer police procedures, or by better officer training and supervision.

Not only is it clear from the FAC that Union City was sued both directly and under the doctrine of respondeat superior, but this distinction was maintained by respondents throughout trial. For example, in closing arguments respondents' counsel painstakingly explained to the jury the difference between the direct and vicarious liability claims being pursued against Union

---

[9] *Ma* was decided by this division, as was *Adams.*

[10] The only other named defendant was Robert Mullins, Jr., the decedent's minor son, who was joined pursuant to Code of Civil Procedure section 382 because he refused to be joined a plaintiff by consent.

[11] Although this cause of action also included reference to "Does 1 through 50," no other individual employees or agents of Union City were later identified by amendment to the complaint.

City: "Now, keep in mind in this case that there are two defendants in this case. . . . If you find that [Woodward] is either negligent or that he committed a battery based on the law and the evidence, then the City is going to be what is called vicariously liable because the acts that he committed were committed in the course and scope of his employment. That's the law the Judge has given you. In addition to that, we have a separate contention in this case that we are making against the City. And that is, that as Mr. Reedy testified and as the evidence showed, that a reasonable police agency or public entity would not have put a person with Officer Woodward's level of training and experience in a position where he was managing a critical incident such as this on the morning of March 7th." This distinction was reemphasized during his rebuttal closing argument, when respondents' counsel explained the special verdict form the jury was to use in its deliberations.

Like the plaintiff in *Eastburn*, respondents have been unable to refer us to any statutory basis either declaring Union City directly liable under the circumstances of this case or, at least, one creating a specific duty of care. Perhaps in recognition of their dilemma, on appeal respondents argue instead that the direct negligence portion of the jury's verdict is premised on vicarious liability principles because "all public entity liability for negligence is vicarious . . . ." But respondents' argument fails for several reasons.

First, the liability of the employer only attaches if and when it is adjudged that the employee was negligent as well. If the agent or employee is exonerated, the principal or employer cannot be held vicariously liable. (7 Witkin, Cal. Procedure, *supra*, Trial, § 368, pp. 418–419.) Furthermore, unless the employee is identified, the trier of fact will not be able to determine if the elements needed to assert vicarious liability have been proved. (CACI No. 3701 (2004 ed.) and Directions for Use.) Thus, the doctrine clearly contemplates that the negligent employee whose conduct is sought to be attributed to the employer at least be specifically identified, if not joined as a defendant.

Additionally, while respondents are correct insofar as they state public entities always act through individuals, that does not convert a claim for direct negligence into one based on vicarious liability. For example, in *Eastburn* as well as in *Ma*, the alleged negligent staffing, training, and promulgation of guidelines for the 911 services at issue were obviously performed by employees of the public entities sued. However, the Supreme Court clearly did not adopt the view that because all entities, public and private, must act through individuals, that suffices to establish *direct liability*. Indeed, the legal distinction between direct and vicarious liability was the whole point and purpose of the *Eastburn* decision. To accept respondents' argument would render the distinction between direct and vicarious liability completely illusory in all cases except where the employer is an individual.

We must also reject respondents' contention that the duty issue addressed by *Eastburn* has been waived by Union City because it was not raised in the trial court. But the issue of duty, or the absence of it, was at the heart of Union City's legal defense throughout the pendency of this case. Union City's demurrer to the original complaint challenged the cause of action alleging direct negligence based on the contention that it did not owe respondents any tort duty: "Plaintiffs have alleged a myriad of conclusory 'duties' beginning with a purported duty to employ, train, supervise and discipline their [sic] officers . . . . Unfortunately, no such statutory duty exists and Plaintiffs fail to allege the origin of such a duty."

The demurrer to the sixth cause of action was overruled, and the "no duty" issue as to the direct negligence claim (sixth cause of action) was again raised by Union City in a subsequent motion for summary judgment.[12] This motion was denied as well.

Similarly, Union City's trial brief flagged for the trial judge the issue of legal duty which had been raised in pretrial motion and which was still unresolved to appellants' satisfaction: "However, a HUGE legal issue remains regarding the legal theories upon which such a case may go forward. As more fully set forth in detail in Defendants' Motion in Limine re Expert Peter Reedy, Plaintiffs have failed to establish any legal 'duties' upon which to base any claims of 'negligence.' "

To be sure, the precise rule articulated by the *Eastburn* decision on the issue of duty was not advanced by Union City, obviously because *Eastburn* had not yet been decided. However, the failure of either side to anticipate the rationale employed in this most recent Supreme Court decision does not amount to a waiver of the issue. *Eastburn* merely represents an evolution in the existing body of law pertaining to public entity tort liability pronounced by our high court only after oral argument, and which this court brought to the attention of the parties.[13] Moreover, there is nothing in *Eastburn* to suggest that it is intended to have only prospective application, and in the absence of such a statement, it clearly applies to this case. (*Newman v. Emerson Radio Corp.* (1989) 48 Cal.3d 973, 978–979 [258 Cal.Rptr. 592, 772 P.2d 1059] [a decision that is disapproved or overruled is considered to

---

[12] The basis for the "no duty" argument at this point was largely premised on our decision in *Adams*. Nonetheless, the precise arguments of counsel were that no other claims against Union City, either direct or vicarious liability, were supported by legally recognized tort duties.

[13] Similarly, while *Ma* centered on the question of public entity tort duties, the precise issue discussed in *Eastburn* was not raised by the parties in *Ma* nor addressed by this court.

have misstated the law, and consequently never was the law]; *In re Retirement Cases* (2003) 110 Cal.App.4th 426 [1 Cal.Rptr.3d 790].)[14]

## VI.

### DISPOSITION

The judgment is affirmed in part and reversed in part. The case is remanded to the trial court with directions to enter a new judgment consistent with the jury's verdict against Woodward and this opinion. Costs on appeal are awarded to respondents.

Haerle, J., concurred.

**KLINE, P. J.**—I agree that law enforcement officers have a duty to refrain from the unreasonable use of deadly force and that there was substantial evidence that the use of deadly force in this case was not reasonable. I also agree that the recent decision of our Supreme Court in *Eastburn v. Regional Fire Protection Authority* (2003) 31 Cal.4th 1175 [7 Cal.Rptr.3d 552, 80 P.3d 656] (*Eastburn*) requires us to reverse that portion of the jury's verdict against the City of Union City, the Union City Police Department, and the Chief of Police (collectively Union City) based on the direct negligence of Union City. For those reasons, I concur in the judgment. I write separately to set forth and explain my disagreement with the majority's view that we would be compelled to reverse the portion of the judgment we allow to stand if we thought the jury's verdict was based on a theory of liability arising from Officer Woodward's conduct prior to the shooting. (Maj. opn., *ante*, at pp. 1098, fn. 4, 1099.) My colleagues' view that the jury should not have considered the "tactical choices" that influenced the officer's preshooting conduct because it could not give rise to duty and was therefore irrelevant to the question of liability is based on the analysis in *Adams v. City of Fremont* (1998) 68 Cal.App.4th 243 [80 Cal.Rptr.2d 196] (*Adams*), which, for the reasons set forth in my dissent in that case, I believe was wrongly decided.

---

[14] At oral argument respondents requested that if we reverse the direct liability portion of the verdict, we should remand the case to the trial court and allow them to amend the FAC to allege their direct negligence claim (the sixth cause of action) as one for vicarious liability. Despite counsel's assurance at oral argument that there was a "wheelbarrow of evidence" pointing to the negligence of identifiable individual employees of Union City other than Woodward, respondents' supplemental brief neither suggests remand, nor offers an explanation as to how the complaint could be amended at this point. (See *Eastburn, supra*, 31 Cal.4th at pp. 1185–1186.) More importantly, this opinion affirms respondents' judgment as to their vicarious liability claim. That claim, therefore, has now been fully adjudicated, and counsel has not explained procedurally how we can allow the amendment and retrial of such a derivative claim without reversing and remanding the entire judgment and jury verdict based on that liability theory.

My colleagues, who were the *Adams* majority and therefore speak with uncommon authority as to its meaning, state that their opinion "stands for the proposition that law enforcement officers are shielded from ordinary negligence claims based on their response to public safety emergencies when those efforts prove to be ineffective in preventing self-inflicted harm or harm caused by third parties." (Maj. opn., *ante*, at p. 1097.) I agree that a law enforcement officer whose efforts to prevent harm are merely "ineffective" cannot for that reason be subjected to liability for ordinary negligence. However, the question in *Adams* and in most other like cases, including the one before us, is not whether the conduct was "ineffective" but whether the nature of the intervention gave rise to a duty to exercise care not to leave the object of the rescue in worse condition than if the intervention had not been attempted. (See Rest.2d Torts, § 323.) As explained in my dissent in *Adams*, this legal principle is closely related to the "special relationship" doctrine articulated by the Supreme Court in, among other cases, *Williams v. State of California* (1983) 34 Cal.3d 18 [192 Cal.Rptr. 233, 664 P.2d 137] (*Williams*): "when the state, through its agents, voluntarily assumes a protective duty toward a certain member of the public and undertakes action on behalf of that member, thereby inducing reliance, it is held to the same standard of care as a private person or organization." (*Id.* at p. 24.) One who voluntarily comes to the aid of another "is under a duty to exercise due care in performance and is liable if (a) his failure to exercise such care increases the risk of such harm, *or* (b) the harm is suffered because of the other's reliance upon the undertaking." (*Id.* at p. 23, citing Rest.2d Torts, § 323, italics added.) In short, the "special relationship" which gives rise to a duty may be created when police conduct "contributed to, increased, or changed the risk which would have otherwise existed." (*Id.* at p. 27.)[1]

My colleagues have never made any attempt to disguise their disdain for the principle set forth in section 323 of the Restatement Second of Torts as explicated by the Supreme Court in *Williams*, at least as applied to conduct they describe as the "tactical choice" or "strategic response" of a law enforcement officer responding to an emergency situation. Deriding judicial applications of section 323 as "pedantic," and claiming that support for the rule eschews "public policy concerns [and] is contrary to modern jurisprudential duty analysis," my colleagues argued in *Adams* that support for the "special relationship" doctrine "relies on dated commentary, predicting a legal trend that never actually materialized." (*Adams, supra*, 68 Cal.App.4th at p. 287.) I shall not here reiterate my refutation of these statements and my

---

[1] Appellants declined to raise the special relationship doctrine in this case, presumably because assignment of their appeal to the division of this court that decided *Adams, supra*, 68 Cal.App.4th 243 would have rendered such an effort quixotic.

belief that the "special relationship" doctrine is a continuing and very progressive development in the law, which does not at all "eschew public policy concerns" and which is, in any case, still firmly established in our jurisprudence.[2]

Whether a law enforcement intervention in an emergency situation creates a "special relationship" invariably depends upon *how* the intervening officer decided to deal with the emergency: that is, whether the officer's conduct either increased the risk of harm or induced the injured party to rely upon his undertaking. For a policy reason it considers paramount, the majority prevents such decisions and their consequences from being considered in connection with the imposition of liability. As the majority states: "Applied to the present case, *Adams* means that the conduct of the police—Woodward's decisions as to how to deploy his officers at the scene, the efforts made in an attempt to defuse the situation as safely as possible, *and other such factors*— cannot subject appellants to liability." (Maj. opn., *ante*, at p. 1097, italics added.) In effect, the majority says that no matter how unnecessarily provocative and unreasonable the tactical decisions of an intervening officer may have been, and regardless of whether they significantly exacerbated the preexisting risk and caused harm, they cannot give rise to liability and therefore cannot be considered.

The majority justifies the exclusion of such evidence on the ground that exposing police officers to tort liability for unreasonable conduct in assisting endangered persons elevates the interests in preserving the life of an endangered person "over the interests of public safety and the physical safety of police officers." (*Adams, supra,* 68 Cal.App.4th at pp. 272.) According to the majority, "the need to protect the overall safety of the community by encouraging law enforcement officers to exercise their best judgment in deciding how to deal with public safety emergencies vastly outweighs the societal value of imposing tort liability for the judgments they make in emergency situations." (Maj. opn., *ante*, at p. 1097.) The assumption that imposing tort liability for law enforcement judgments conflicts with the interests of public safety and the physical safety of police officers is based on

---

[2] Even Professor Prosser, whose authority is invoked by the *Adams* majority (*Adams, supra,* 68 Cal.App.4th at p. 286), agreed that American courts are enlarging the number and scope of special relationships for which an affirmative duty may be imposed. (Prosser, Handbook of the Law of Torts (4th ed. 1971) § 56, pp. 338–343. The most recent edition of the Prosser treatise takes the same view (Prosser & Keeton, The Law of Torts (5th ed. 1984) § 56, pp. 373–385) as does the successor treatise (2 Dobbs, The Law of Torts (2001) §§ 314–320, pp. 853–869 ["Sometimes the defendant is under a duty to use reasonable care to rescue the plaintiff because the defendant stands in a special relationship to the plaintiff or to a person causing harm to the plaintiff." (p. 857.) Thus, "[w]hen the defendant acts affirmatively to aid a person who is helpless, he must of course act with reasonable care. It will not do to lift the stranded plaintiff from an ice gorge in a helicopter and then negligently drop her." (p. 859.)].)

the belief that the police would not intervene effectively or at all in crisis situations if their tactical choices could subject them to liability. *(Id.* at p. 1096.) The majority would therefore bar the use of tort liability as a way in which to encourage reasonable tactical decisions by law enforcement officers.

Although some commentators do not believe the "special relationship" doctrine goes far enough to impose a justifiable duty on the police (see, e.g., McCabe, *Police Officers' Duty to Rescue or Aid: Are They Only Good Samaritans* (1984) 72 Cal. L.Rev. 661, and authorities there cited), and some American states and most European nations *do* go further by imposing on law enforcement officers a legal duty to rescue *(id.* at p. 672), application of the "special relationship" doctrine to law enforcement officers is California's compromise solution to the moral problem that would be created by wholly relieving such officers of any duty to rescue. (See Ames, *Law and Morals* (1908) 22 Harv. L.Rev. 97, 103–113; Bohlen, *The Moral Duty to Aid Others as a Basis of Tort Liability* (1908) 56 U. Pa. L.Rev. 217.) *Adams's* constriction of the doctrine, by excluding from its purview conduct that could be characterized as a "tactical choice" or a "strategic response" to an emergency situation, is jurisprudentially unprecedented and, at least in my view, exceedingly unwise.

By ignoring the profound consequences "tactical choices" may have, *Adams* frees the police to employ outrageously dangerous tactics. Consider, for example, a hypothetical situation in which a police officer intervenes to prevent a distressed woman from carrying out a threat to kill herself. The officer makes the "tactical" decisions to exclude others from the scene, including the parish priest with whom he knows the woman has a close relationship, and to treat her threat as merely a bluff. When the woman threatens to kill herself if the advancing officer takes another step toward her, he ignores the warning, continues advancing, and she thereupon turns her weapon on herself, committing suicide. The officer's exercise of "judgment in deciding how to deal with [the] public safety emergenc[y]" (see maj. opn., *ante,* at p. 1097) in this hypothetical situation did not involve the use of deadly force and was neither an intentional tort nor the violation of constitutional or other federally protected right, but rather a "tactical" or "strategic" choice for which the majority believe liability should not attach. The majority would not allow evidence of the conduct to be used as a basis upon which to impose a duty or find liability, despite the fact that the officer assumed complete control of the scene, inducing reliance, and increased the preexisting risk of harm. Under the "special relationship" doctrine *either* of those factors would give rise to a duty of care. (See 2 Dobbs, The Law of Torts, *supra,* §§ 317–319, pp. 857–864.)

Fortunately, California courts have not been persuaded to adopt this approach, and still receive and consider evidence offered to show that "tactical choices" of police officers induced reliance or increased the risk of harm and therefore created a "special relationship" giving rise to a duty of care. (See, e.g., *Benavidez v. San Jose Police Dept.* (1999) 71 Cal.App.4th 853 [84 Cal.Rptr.2d 157], which, without reference to *Adams*, found the proffered evidence relevant to the legal question whether a "special relationship" was created by strategic law enforcement decisions but found it insufficient.)

The rationale for the majority's refusal to apply the "special relationship" doctrine where the conduct in question represents a law enforcement officer's "tactical choice" is that doing so—that is, imposing a duty to make a *reasonable* (though not necessarily effective) "tactical choice"—would "likely result in more deaths or injuries." (*Adams, supra,* 68 Cal.App.4th at p. 273.) "[I]mposing a duty of care would actually threaten, and not promote, public safety" (maj. opn., *ante,* at p. 1096), the majority explains, because " '[k]nowledge that any unsuccessful attempt at intervention will be subjected to second-guessing by experts with the 20/20 vision of hindsight years following the crisis is likely to deter the police from taking decisive action to protect themselves and third parties.' " (*Ibid.,* quoting *Adams, supra,* 68 Cal.App.4th at p. 272.) This fear seems to me entirely speculative and wholly unjustified. I am unaware of any evidence justifying the assumption law enforcement officers will be deterred from providing assistance in crisis situations due to the fear either that courts will hold them to unrealistic standards of care or that their decisions will be unfairly second-guessed by juries indifferent to the difficulty of the decisions they are called upon to make in stressful situations.

Nor does the California Supreme Court share my colleagues' fear that such use of the "special relationship" doctrine will result in unfair "second-guessing" or impair public safety. In *Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703 [110 Cal.Rptr.2d 528, 28 P.3d 249] (*Lugtu*), the Court recently held that a law enforcement officer has a duty to exercise reasonable care for the safety of persons whom the officer stops. Relying on its earlier opinion in *Williams,* the Supreme Court emphasized that "a duty of care does arise when an officer engages in '*an affirmative act which places the person in peril or increases the risk of harm . . . .*' " (*Lugtu,* at p. 717, quoting *Williams, supra,* 34 Cal.3d at p. 24, italics added in *Lugtu.*) In the course of its opinion, the majority in *Lugtu* addressed the defendants' argument "that the application of ordinary negligence principles . . . will impair the ability of CHP officers to carry out their responsibilities and will result in an inordinate financial liability to the state, *because juries will be too*

*ready to second-guess police officers in the exercise of their discretion in making traffic stops.*" (*Lugtu*, at p. 721, italics added.) The court rejected this argument, pointing out, among other things, that the numerous considerations a law enforcement officer is required to take into account in the performance of his or her duties "are not beyond the understanding or experience of most jurors, and there is little reason to suspect that juries in general will not grant an officer engaged in law enforcement duties appropriate leeway in assessing the reasonableness of the officer's conduct." (*Id.* at p. 722.)[3] (The majority in *Lugtu* did not, of course, mention the different opinion expressed by the majority in *Adams*, but it was relied upon by Justice Brown in her dissent. (*Lugtu*, at p. 733, dis. opn. of Brown, J.)

California law enforcement officers undergo extensive training, which includes training in how to reasonably respond to crisis situations requiring rescue efforts. As in *Adams* and the present case, citizens typically request police intervention in such situations and the police invariably respond. Members of the public who seek rescue assistance justifiably expect the police to know what they are doing and to act reasonably in the circumstances. Imposition of liability for unreasonable "tactical choices" that conflict with approved police procedures (whether mandated by law or not), which induce reliance or increase the preexisting risk of harm, and which proximately cause injury, would not only meet the societal goal of compensating injured tort victims, but would act as an incentive to police officers to provide better police services and also encourage police departments and municipalities to hire competent officers and to train them well.

---

[3] *Lugtu* is also inconsistent with *Adams* on another issue. The "special relationship" doctrine may apply where the defendant's negligence constitutes an omission, but it is more likely to apply where the defendant's *misfeasance*, as opposed to *nonfeasance*, is the basis of the claim of negligence. (*Marois v. Royal Investigation & Patrol, Inc.* (1984) 162 Cal.App.3d 193, 198 [208 Cal.Rptr. 384].) My colleagues' attack on the doctrine in *Adams* rested in part on their view that "[t]he false expediency of this misfeasance/nonfeasance distinction has been persuasively exposed and criticized in recent law review commentary . . . eliminating this distinction as a meaningful way to apply tort doctrine" (*Adams, supra,* 68 Cal.App.4th at p. 287, fn. omitted.) My colleagues have apparently not persuaded our Supreme Court, which in *Lugtu* relied on the very distinction they so abjure. The Court cited with approval the statement in *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 49 [123 Cal.Rptr. 468, 539 P.2d 36], that " '[m]isfeasance exists when the defendant is responsible for making the plaintiff's position worse, i.e., defendant has created a risk. Conversely, nonfeasance is found when the defendant has failed to aid plaintiff through beneficial intervention.' " (*Lugtu, supra,* 26 Cal.4th at p. 716.) Applying this test, the Supreme Court concluded that the plaintiff's action in *Lugtu* was "based upon a claim of misfeasance, not nonfeasance." (*Id.* at p. 717; see also Prosser & Keeton, The Law of Torts, *supra,* § 56, p. 378 ["If there is no duty to go to the assistance of a person in difficulty or peril, there is at least a duty to avoid any *affirmative* acts which make his situation worse. *When we cross the line into the field of 'misfeasance,' liability is far easier to find.*" (Italics added.)].)

For the foregoing reasons, I would not reverse the judgment in this case even if I believed the verdict resulted in part from the jury's consideration of circumstances giving rise to the shooting of Lucilla.

Petitions for a rehearing were denied August 17, 2004, and the opinion was modified to read as printed above.