**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHELSEY HAYES, a minor by and
through her guardian ad litem,
                    *Plaintiff-Appellant,*

            v.

COUNTY OF SAN DIEGO, DBA San
Diego County Sheriff's
Department; SUE GEER, MIKE
KING,
                    *Defendants-Appellees.*

No. 09-55644

D.C. No.
3:07-cv-01738-
DMS-JMA

OPINION

Appeal from the United States District Court
for the Southern District of California
Dana M. Sabraw, District Judge, Presiding

Argued and Submitted
June 9, 2010—Pasadena, California

Filed March 22, 2011

Before: Alfred T. Goodwin and Johnnie B. Rawlinson,
Circuit Judges, and Algenon L. Marbley, District Judge.*

Opinion by Judge Goodwin;
Partial Concurrence and Partial Dissent by Judge Rawlinson

*The Honorable Algenon L. Marbley, U.S. District Judge for the Southern District of Ohio, sitting by designation.

**COUNSEL**

Alvin M. Gomez, The Gomez Law Group, San Diego, California, for the plaintiff-appellant.

Morris G. Hill, Senior Deputy, John J. Sansone, County Counsel, County of San Diego, San Diego, California, for the defendants-appellees.

**OPINION**

GOODWIN, Circuit Judge:

On the night of September 17, 2006, Shane Hayes was shot and killed inside his home by San Diego County Sheriff's Deputies Mike King and Sue Geer. Hayes's minor daughter filed suit against the deputies and the County of San Diego, alleging state and federal claims stemming from the incident. The district court granted Defendants summary judgment on all claims, and Plaintiff timely appealed. For the reasons that follow, we affirm in part, reverse in part and remand for further proceedings.

## I.  FACTUAL BACKGROUND

Deputy King arrived at Hayes's residence at 9:12 p.m. in response to a domestic disturbance call from a neighbor who had heard screaming coming from the house. Hayes's girlfriend Geri Neill, who owned the house, spoke with Deputy King at the front door. During a three-minute conversation, Neill advised Deputy King that she and Hayes had been arguing about his attempt that night to commit suicide by inhaling exhaust fumes from his car. She told Deputy King that there had not been a physical altercation between them, rather she was concerned about Hayes harming himself, indicating that he had attempted to do so on prior occasions. Deputy King did not ask Neill about the manner of Hayes's prior suicide attempts and was unaware that he had previously stabbed himself with a knife. Although Neill advised Deputy King that there were no guns in the house, she made no indication that Hayes might be armed with a knife.

At 9:16 p.m., Deputy Geer arrived at the scene and was advised by Deputy King that there was a subject inside the house who was potentially suicidal. Based on the concern that Hayes might harm himself, the deputies decided to enter the house to check on Hayes's welfare, a process Deputy King described as seeing whether Hayes could "physically or mentally care" for himself. While Neill later stated that Hayes had been drinking heavily that night, Deputy King had not asked Neill whether Hayes was under the influence of drugs or alcohol. Although the deputies had been sent a notification that Hayes was intoxicated, neither deputy was aware of this information before entering the house. The deputies had also not checked whether there had been previous calls to the residence and were unaware that Hayes had been taken into protective custody four months earlier in connection with his suicide attempt involving a knife.

Upon entry, both deputies had their guns holstered. Deputy King was also carrying a Taser. While moving in the dimly

lit house, Deputy King advanced ahead of Deputy Geer and was using his sixteen-inch flashlight, which he had been trained to use as an impact weapon.

Once in the living room, Deputy King saw Hayes in an adjacent kitchen area, approximately eight feet away from him. Because Hayes's right hand was behind his back when Deputy King first saw him, Deputy King testified that he ordered Hayes to "show me his hands." While taking one to two steps towards Deputy King, Hayes raised both his hands to approximately shoulder level, revealing a large knife pointed tip down in his right hand. Believing that Hayes represented a threat to his safety, Deputy King immediately drew his gun and fired two shots at Hayes, striking him while he stood roughly six to eight feet away from him. Deputy Geer simultaneously pulled her gun as well, firing two additional rounds at Hayes.

Deputy King testified that only four seconds elapsed between the time he ordered Hayes to show his hands and the time the first shot was fired. When asked why he believed Hayes was going to continue at him with the knife, Deputy King testified: "Because he wasn't stopping." Neither deputy had ordered Hayes to stop. While stating that such a command would have only taken "a split second," Deputy King testified that "I didn't believe I had any time."

Neill witnessed the shooting from behind Deputy Geer and testified that Hayes was walking towards the deputies with the knife raised at the time the shots were fired. She stated, however, that Hayes was not "charging" at the officers and had a "clueless" expression on his face at the time, which she described as "like nothing's working upstairs." Neil testified that just before the shooting, Hayes had said to the officers: "You want to take me to jail or you want to take me to prison, go ahead."

## II. DISCUSSION

Hayes's minor daughter, Chelsey Hayes, filed suit against the deputies and the County of San Diego, alleging claims under 42 U.S.C. § 1983 for alleged violations of her deceased father's Fourth Amendment rights and her own Fourteenth Amendment rights. The complaint also included state law claims for negligent wrongful death and negligent hiring, training and supervision by the County. While finding Chelsey Hayes had standing to assert survival claims, the district court nonetheless granted defendants summary judgment on all her causes of action.

Chelsey Hayes appeals the district court's grant of summary judgment, except for her claim of negligent hiring, training and supervision by the County.[1] In responding, Appellees contest the district court's finding that Chelsey Hayes has standing to assert survival claims based on violations of her father's constitutional rights.

### A. Standing to Assert Survival Claims

[1] "In § 1983 actions, . . . the survivors of an individual killed as a result of an officer's excessive use of force may assert a Fourth Amendment claim on that individual's behalf if the relevant state's law authorizes a survival action. The party seeking to bring a survival action bears the burden of demonstrating that a particular state's law authorizes a survival action and that the plaintiff meets that state's requirements for bringing a survival action." *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998) (internal citation omitted).

---

[1]Appellant's opening and reply briefs fail to address the district court's dismissal of her claim against the County for negligent hiring, training and supervision. Accordingly, any appeal of the district court's dismissal of this claim is waived. *See Martinez-Serrano v. INS*, 94 F.3d 1256, 1259-60 (9th Cir. 1996) (issues not specifically raised and argued in a party's opening brief are waived).

In finding that Chelsey Hayes met California's statutory requirements to bring a survival action, the district court relied upon California Code of Civil Procedure § 377.60. The district court erred in doing so because § 377.60 relates to wrongful death actions that are based on personal injuries resulting from the death of another, not survival actions that are based on injuries incurred by the decedent. *See* CAL. CODE CIV. PROC. § 377.60 ("A cause of action for the death of a person caused by the wrongful act or neglect of another may be asserted by any of the following persons . . . ."); *Schwarder v. United States*, 974 F.2d 1118, 1123 n. 3 (9th Cir. 1992) ("[T]he cause of action granted by Section 377 to the heirs and personal representatives of a decedent is not derivative in character or a continuation or revival of a cause of action existing in the decedent before his death, but is an original and distinct cause of action granted to the heirs and personal representatives of the decedent to recover damages sustained by them by reason of the wrongful death of the decedent.") (quoting *Van Sickel v. United States*, 285 F.2d 87, 90 (9th Cir. 1960); *see also Davis v. Bender Shipbuilding & Repair Co.*, 27 F.3d 426, 429 (9th Cir. 1994) ("In a survival action, a decedent's estate may recover damages on behalf of the decedent for injuries that the decedent has sustained. In a wrongful death action, by comparison, the decedent's dependents may only pursue claims for personal injuries they have suffered as a result of a wrongful death.").

**[2]** California's statutory requirements for standing to bring a survival action are stated under California Code of Civil Procedure § 377.30: "A cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in interest . . . , and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest." *See also Tatum v. City & County of San Francisco*, 441 F.3d 1090, 1094 (9th Cir. 2006) ("Where there is no personal representative for the estate, the decedent's 'successor in interest' may prosecute the survival action if the person pur-

porting to act as successor in interest satisfies the requirements of California law . . . .") (citing CAL. CODE CIV. PROC. §§ 377.30, 377.32). While claiming she is the decedent's "sole surviving heir," Appellant fails to allege that she is her father's personal representative or successor in interest. Indeed, Appellant argues only that standing is appropriate under § 377.60, not § 377.30. There is no indication Appellant has filed the affidavit necessary under California law to commence a survival action as a decedent's successor in interest, *see* CAL. CODE CIV. PROC. § 377.32, or whether survival claims may now be time barred if Appellant has failed to do so.

**[3]** Because it is unclear on the present record whether Appellant has standing to assert survival claims based on her father's constitutional rights, we do not address the district court's further finding of qualified immunity in relation to the alleged Fourth Amendment violations. Accordingly, we remand this issue to the district court for a decision whether Chelsey Hayes has standing to assert survival claims based on alleged violations of her father's rights under the Fourth Amendment.

## B. Alleged Fourteenth Amendment Violations

**[4]** This Circuit has recognized that a child has a constitutionally protected liberty interest under the Fourteenth Amendment in the "companionship and society" of her father. *Curnow*, 952 F.2d at 325; *Moreland*, 159 F.3d at 371. "Official conduct that 'shocks the conscience' in depriving [a child] of that interest is cognizable as a violation of due process." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). In determining whether excessive force shocks the conscience, the court must first ask "whether the circumstances are such that actual deliberation [by the officer] is practical." *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting *Moreland*, 159 F.3d at 372 (internal quotation marks omitted)). "Where actual deliberation is practical, then an

officer's 'deliberate indifference' may suffice to shock the conscience. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Wilkinson*, 610 F.3d at 554.

Here, the district court correctly applied the purpose-to-harm standard based on the deputies' snap decision that Hayes represented an immediate threat. Neill had advised Deputy King that there were no guns in the house, and the deputies entered the residence with their guns holstered, apparently not expecting a violent confrontation with Hayes.[2] After Deputy King ordered Hayes to show his hands, Hayes raised both his hands to approximately shoulder level, revealing a large knife pointed tip down in his right hand. Believing that Hayes represented a threat, both deputies immediately drew their guns and fired at Hayes.

[5] The decision to use deadly force against Hayes was a snap judgement based on the unexpected appearance of a knife in his hand. Deputy King testified that only four seconds elapsed between the time he ordered Hayes to show his hands and the time the first shot was fired, stating that he did not feel there was time to give Hayes a warning before firing. Appellant argues that the deputies could have potentially avoided the incident by obtaining more information about Hayes or requesting a psychiatric emergency response team ("PERT") before entering the house, but that option expired when the deputies entered the house. The decision to employ

---

[2]We note that Appellant makes no argument that this warrantless entry itself violated Hayes's Fourth Amendment rights. Indeed, such an argument would likely be unavailing in light of the emergency exception to the warrant requirement. *See United States v. Russell*, 436 F.3d 1086, 1094 (9th Cir. 2006) ("At issue in this case is the emergency exception to the warrant requirement, which permits a warrantless search when officers 'reasonably believe that a person within is in need of immediate aid.' ") (quoting *Mincey v. Arizona*, 437 U.S. 385, 392 (1978)).

deadly force in reaction to seeing the knife was sudden and did not include deliberation. *Cf. Wilkinson*, 610 F.3d at 554 (finding purpose-to-harm standard appropriate where "[w]ithin a matter of seconds, the situation evolved from a car chase to a situation involving an accelerating vehicle in dangerously close proximity to officers on foot"); *Porter*, 546 F.3d at 1139 (finding actual deliberation was not practical where a five-minute altercation between the officers and victim evolved quickly and forced the officers to make "repeated split-second decisions"). Accordingly, the purpose-to-harm standard is appropriate in this case.

**[6]** Appellant makes no claim that the deputies acted with a purpose to harm unrelated to the legitimate law-enforcement objective of defending themselves, arguing only that the deliberate-indifference standard should have been applied. Indeed, there is no evidence that the deputies fired their weapons for any purpose other than self-defense. Accordingly, Appellant failed to support her substantive due process claim. *See Wilkinson*, 610 F.3d at 554-55. We therefore affirm the summary judgment as to the § 1983 claim based on a violation of Appellant's rights under the Fourteenth Amendment.

## C. *Monell* **Claims of Municipal Liability under § 1983**

**[7]** Finding no violation of either Hayes's or Appellant's constitutional rights, the district court granted the County summary judgment on all claims to municipal liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Because we agree that there was no violation of Appellant's rights under the Fourteenth Amendment, we affirm summary judgement to the County as to any *Monell* claim made on this basis. *See Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835-36 (9th Cir. 1996) (noting that a constitutional violation is required to support *Monell* liability).

**[8]** As noted, however, we have declined to address the district court's decision regarding alleged violations of

Hayes's Fourth Amendment rights because it is unclear that Appellant has standing to assert such survival claims. Accordingly, we remand Appellant's *Monell* claim based on alleged violations of her father's constitutional rights to the district court for a determination of whether Chelsey Hayes has standing to assert survival claims based on alleged violations of her father's rights under the Fourth Amendment.

## D.  Negligent Wrongful Death

**[9]** To support a claim of negligent wrongful death against law enforcement officers, a plaintiff must establish the standard elements of negligence: defendants owed a duty of care; defendants breached their duty; and defendants' breach caused plaintiff's injury. *See Wright v. City of Los Angeles*, 219 Cal.App.3d 318, 344, 268 (1990). Appellant contends that the deputies were negligent both in their conduct prior to the shooting and in their ultimate decision to use deadly force. In rejecting this claim, the district court held that the deputies owed Hayes no duty of care related to their preshooting conduct, never addressing whether the deputies' preshooting conduct was negligent or was the cause of Hayes's death. As to the decision to use deadly force, the district court held that the deputies' use of force was objectively reasonable and therefore not negligent.

### 1.  Preshooting Conduct

"While breach of duty and proximate cause normally present factual questions, the existence of a legal duty in a given factual situation is a question of law for the courts to determine." *Jackson v. Ryder Truck Rental, Inc.*, 16 Cal.App.4th 1830, 1838 (1993) (quoting *Andrews v. Wells,* 204 Cal.App.3d 533, 538 (1988). In evaluating state law, "where the state's highest court has not decided an issue, the task of the federal courts is to predict how the state high court would resolve it."[3] *Westlands Water Dist. v. Amoco Chemical Co.*,

---

[3]It is unclear from the complaint whether Appellant sought federal jurisdiction on the basis of her federal claims under 28 U.S.C. § 1331, on the

953 F.2d 1109, 1111 (9th Cir. 1991) (quoting *Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 186 (9th Cir. 1989) (internal quotation marks omitted). "In undertaking this analysis, 'a federal court . . . is not free to reject a state judicial rule of law merely because it has not received the sanction of the state's highest court.' " *Katz v. Children's Hosp.*, 28 F.3d 1520, 1528-29 (9th Cir. 1994) (quoting *Estrella v. Brandt*, 682 F.2d 814, 817 (9th Cir. 1982). "An intermediate state appellate court decision is a 'datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.' " *Estrella*, 682 F.2d at 817 (quoting *West v. A.T.&T. Co.*, 311 U.S. 223, 237 (1940)).

The California Supreme Court has held that "an officer's lack of due care can give rise to negligence liability for the intentional shooting death of a suspect." *Munoz v. Olin*, 24 Cal.3d 629, 634 (1979) (citing *Grudt v. City of Los Angeles*, 2 Cal. 3d 575, 587 (1970). While this tort duty has been expressly applied to the use of deadly force, *see id.*, "[t]here remains an open question . . . whether an officer's lack of due care with respect to preshooting tactical decisions can give rise to liability for negligence." *Brown v. Ransweiler*, 171 Cal.App.4th 516, 534 (2009).

**[10]** Appellant contends that Deputies King and Geer were negligent because they failed to gather all potentially available information about Hayes or request a PERT team before confronting him. Relying on two California intermediate appellate court decisions, the district court held that the deputies owed no duty of care for this preshooting conduct. *See*

basis of diversity of citizenship under § 1332 or both. Regardless, we must interpret relevant state law based on the guidance provided by the California state courts. *See Katz v. Children's Hosp.*, 28 F.3d 1520, 1529 (9th Cir. 1994).

*Adams v. City of Fremont*, 68 Cal.App.4th 243, 276 (1998) ("On balance, the relevant public policy considerations militate against imposing a legal duty on police officers to take reasonable steps to prevent a threatened suicide from being carried out."); *Munoz v. City of Union City*, 120 Cal.App.4th 1077, 1097 (2004) ("[L]ike *Adams*, the need to protect the overall safety of the community by encouraging law enforcement officers to exercise their best judgment in deciding how to deal with public safety emergencies vastly outweighs the societal value of imposing tort liability for the judgments they make in emergency situations."). Both *City of Union City* and *Adams* relied upon factors outlined by the California Supreme Court in *Rowland v. Christian*, 69 Cal.2d 108, 112-13 (1968), for determining when a tort duty is owed. Further, the court in *City of Union City* directly held that a police commander could be found negligent only for his decision to use deadly force in an emergency situation, not for his preshooting conduct. 120 Cal.App.4th at 1094-1110.

**[11]** After the district court granted summary judgment, however, the California Supreme Court indicated that law enforcement officers might be subject to negligence liability for certain preshooting conduct. *Hernandez v. City of Pomona*, 46 Cal.4th 501, 515-22 (2009). In *Hernandez*, the court granted review to consider the following question: "When a federal court enters judgment in favor of the defendants in a civil rights claim brought under 42 United States Code section 1983 . . . , in which the plaintiffs seek damages for police use of deadly and constitutionally excessive force in pursuing a suspect, and the court then dismisses a supplemental state law wrongful death claim arising out of the same incident, what, if any, preclusive effect does the judgment have in a subsequent state court wrongful death action?" *Id.* at 505. The court held "that on the record and conceded facts here, the federal judgment collaterally estops plaintiffs from pursuing their wrongful death claim, even on the theory that the officers' preshooting conduct was negligent." *Id.* at 506. In doing so, the California Supreme Court did not hold that

law enforcement officers owed no duty of care in regards to preshooting conduct, as the lower court in *City of Union City* had held. Instead, the court found that the officers' preshooting conduct did not breach applicable standards of care. *Id.* at 515-22.

[12] The court in *Hernandez* did not address *City of Union City* or *Adams*, nor did it expressly determine that law enforcement officers owe a duty of care in regards to preshooting conduct. Nevertheless, the court's analysis of whether the officers' preshooting conduct independently constituted breach of a duty of care strongly indicates that California's highest court would not adopt a rule that officers owe no such duty. Indeed, in a concurring opinion, Justice Moreno argued that the court should not have reached the issue "because plaintiffs are entitled to amend their complaint to allege preshooting negligence." *Id.* at 522 (Moreno, J., concurring). The majority responded, stating "we find that plaintiffs have adequately shown how they would amend their complaint to allege a preshooting negligence claim, and that we must determine whether any of the preshooting acts plaintiffs have identified can support negligence liability." *Id.* at 521 n.18. This discussion strongly indicates that the California Supreme Court believes a duty of care is owed and that courts must address breach and causation.[4]

---

[4]In stating that the *Hernandez* court "expressly reserved" the question of whether officers owe a duty related to their preshooting conduct, the dissent suggests that the court avoided any discussion of the viability of a negligence claim based on preshooting conduct. To the contrary, the court discussed at length the standard of care applicable to such negligence claims, declining to discuss the issue of duty because it found no viable claim of breach. Indeed, the discussion identified between the majority and concurring opinions clearly suggests that the claim could have been amended, an option that would fail as a matter of law if officers owe no duty related to preshooting conduct. As noted, we are required to predict how the state's Supreme Court would rule on an issue, *Westlands Water Dist.*, 953 F.2d at 1111, and intermediate appellate court decisions are evaluated only to assist in this prediction, *Estrella*, 682 F.2d at 817. The approach taken by the California Supreme Court in *Hernandez* conflicts sharply with the holdings of the lower appellate courts in *City of Union City* and *Adams*. Contrary to the dissent's assertion, therefore, these cases cannot be considered persuasive on this issue.

**[13]** On the basis of the discussion in *Hernandez*, we conclude that the California Supreme Court is unlikely to find law enforcement officers owe no duty of care in regards to their preshooting conduct in emergency situations. Accordingly, we reverse the district court's holding that Deputies King and Geer owed no such duty, and remand for a decision on the relevant standard of care, whether the deputies breached this standard, and whether any such breach caused Hayes's death.

## 2.   Use of Deadly Force

**[14]** As noted, under California negligence law, "police officers have a duty to use reasonable care in employing deadly force." *City of Union City*, 120 Cal.App.4th at 1097 (citing *Grudt*, 2 Cal.3d 575 and *Munoz*, 24 Cal.3d 629). Claims of excessive force under California law are analyzed under the same standard of objective reasonableness used in Fourth Amendment claims. *See In re Joseph F.*, 85 Cal.App.4th 975, 989 (2000) (citing *Martinez v. County of Los Angeles*, 47 Cal.App.4th 334, 343 (1996)); *see also Edson v. City of Anaheim*, 63 Cal.App.4th 1269, 1274 (1998) (noting that 42 U.S.C. § 1983 is "the federal counterpart of state battery or wrongful death actions"); *Brown*, 171 Cal.App.4th at 527 n.11 ("Because federal civil rights claims of excessive use of force are the federal counterpart to state battery and wrongful death claims, federal cases are instructive in this area."). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). To do so, a court must pay "careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* We also consider, under the totality of the circumstances, the "quantum of force" used, *Davis v. City of Las*

*Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007), the availability of less severe alternatives, *id.* at 1054, and the suspect's mental and emotional state, *see Deorle v. Rutherford*, 272 F.3d 1272, 1282 (9th Cir. 2001). All determinations of unreasonable force, however, "must embody allowance for the fact that police officers are often forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

**[15]** Although we view the evidence in the light most favorable to Appellant in reviewing summary judgement, *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998), we can only consider the circumstances of which Deputies King and Geer were aware when they employed deadly force. *See Graham*, 490 U.S. at 396. Accordingly, we cannot consider the fact that Hayes was intoxicated or that he had previously used a knife in harming himself when evaluating the circumstances under which the deputies used deadly force.

**[16]** In considering the first and third factors under *Graham*, it is undisputed that Hayes had committed no crime, and there is no evidence suggesting that Hayes was "actively resisting arrest or attempting to evade arrest." 490 U.S. at 396. Taken in the light most favorable to Appellant, Hayes appears to have been complying with Deputy King's order to show his hands when Hayes raised his hands and revealed the knife. His statement that the deputies could take him to jail further suggests his compliance at the time. Although Hayes was walking towards the deputies, he was not charging them, and had not been ordered to stop. He had committed no crime and had followed all orders from the deputies at the time he was shot.[5]

---

[5]In *Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985), the Supreme Court stated a probable cause standard for determining whether a fleeing suspect poses a threat of serious physical harm to officers or others. Although Hayes seemed to believe he was going to be arrested, he was not suspected of a crime by the deputies and was not apparently attempting to evade them. Accordingly, this standard would not apply here.

The central issue is whether it was objectively reasonable under the circumstances for the deputies to believe that Hayes posed an immediate threat to their safety, warranting the immediate use of deadly force, rather than less severe alternatives—such as an order to stop, an order to drop the knife, or a warning that deadly force would be used if Hayes came any closer to the deputies.[6] *See Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) (en banc) (noting that the second factor under *Graham* is the "most important") (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)). Based on the undisputed facts that Hayes was moving toward Deputy King with the knife raised, the district court found as a matter of law that the deputies' use of deadly force was objectively reasonable due to the threat to the officers' safety.

**[17]** Considering all the circumstances in the light most favorable to the Appellant, we cannot agree. "[T]he mere fact that a suspect possesses a weapon does not justify deadly force." *Haugen v. Brosseau*, 351 F.3d 372, 381 (9th Cir. 2003) (citing *Harris v. Roderick*, 126 F.3d 1189, 1202 (9th Cir. 1997) (holding, in the Ruby Ridge civil case, that the FBI's directive to kill any armed adult male was constitutionally unreasonable even though a United States Marshal had already been shot and killed by one of the males); *Curnow*, 952 F.2d at 324-25 (holding that deadly force was unreasonable where the suspect possessed a gun but was not pointing it at the officers and was not facing the officers when they shot). Accordingly, Hayes's unexpected possession of the knife alone—particularly when he had committed no crime and was confronted inside his own home—was not sufficient reason for the officers to employ deadly force.

**[18]** On the other hand, threatening an officer with a

---

[6]While Deputy King was carrying a Taser, he testified that he believed it would take between ten to fifteen seconds to unholster and use the device, indicating that the Taser was not a viable alternative under the circumstances.

weapon does justify the use of deadly force. *See, e.g., Smith*, 394 F.3d at 704 (recognizing that "where a suspect threatens an officer with a weapon such as a gun or knife, the officer is justified in using deadly force"); *Reynolds v. County of San Diego*, 84 F.3d 1162, 1168 (9th Cir. 1996) (holding deadly force reasonable where suspect, who was behaving erratically, swung a knife at an officer), overruled on other grounds in *Acri v. Varian Associates, Inc.*, 114 F.3d 999 (9th Cir. 1997).[7] There is no clear evidence, however, that Hayes was threatening the officers with the knife here. Prior to entering the house, the deputies were told that Hayes had only threatened to harm himself, not others. Nor did the deputies witness Hayes acting erratically with the knife. *Cf. Reynolds*, 84 F.3d at 1168 (finding that it was reasonable for an officer to

---

[7]In suggesting that Deputy King had "probable cause to believe that his life was in danger," the dissent mistakenly equates the facts found in *Reynolds* with those here, ignoring the significant differences between the two situations. In *Reynolds*, a man was outside a gas station, wielding a knife, and "behaving in a strange manner." 84 F.3d at 1164. The man was ordered multiple times by an officer to drop the knife, but when the officer attempted to restrain him, the man made a "sudden" swing at the officer with the knife. *Id.* at 1164-65. This court found the suspect's actions constituted a direct threat to the officer's life, justifying the officer's use of deadly force. Id. at 1170. The circumstances here are distinguishable from *Reynolds* because the evidence suggesting that Hayes presented an immediate threat to officer safety is unclear, raising a greater question as to the reasonableness of the officer's action compared to the officer in *Reynolds*. Specifically, there is no evidence that Hayes was ever ordered to drop the knife or that he swung the knife at Deputy King. Further, Hayes was standing in his own kitchen, eight feet away from Deputy King, and was not suspected of any crime. The dissent accurately points out that "the events in this case unfolded rapidly within a dimly lit, confined space." Yet the lack of clarity created by these circumstances is not cause to simply adopt the officer's explanation of their actions. To the contrary, a court must determine on summary judgment whether there is any issue of material fact that would contradict an otherwise reasonable justification for use of force. As discussed, there remain genuine issues of material fact here as to whether Hayes represented an immediate threat to officer safety. This finding is not merely a 20/20 hindsight analysis as the dissent suggests, but an acknowledgment of a court's limited role at the summary judgment stage in determining objective reasonableness under *Graham*.

attempt to restrain a suspect where the suspect possessed a knife and was acting erratically because the suspect was perceived as a threat by others in the area).

Deputy King indicated that it was Hayes's movement towards him that caused him to believe Hayes was an immediate threat. "A simple statement by an officer that he fears for his safety or the safety others is not enough [however]; there must be objective factors to justify such a concern." *Deorle*, 272 F.3d at 1281. Neill stated that Hayes was not charging Deputy King and described Hayes's expression as "clueless" when walking towards the deputies. As noted, Hayes had not been told to stop or been given any indication that his actions were perceived as a threat. Further, Hayes was still six to eight feet away from Deputy King at the time he was shot. Accordingly, the present evidence does not clearly establish that Hayes was threatening the deputies with the knife.

**[19]** Finally, it is significant that Hayes was given no warning before the deputies shot him. As noted by the court in *Deorle:*

> The absence of a warning or an order to halt is also a factor that influences our decision. Shooting a person who is making a disturbance because he walks in the direction of an officer at a steady gait with a can or bottle in his hand is clearly not objectively reasonable. Certainly it is not objectively reasonable to do so when the officer neither orders the individual to stop nor to drop the can or bottle, and does not even warn him that he will be fired upon if he fails to halt. Appropriate warnings comport with actual police practice. . . . We do not hold, however, that warnings are required whenever less than deadly force is employed. Rather, we simply determine that such warnings should be given, when feasible, if the use of force may result in serious injury, and that the

> giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test.

*Id.* at 1283-84. The San Diego County Sheriff's Department Guidelines regarding use of force reflect the importance of warning a suspect before using deadly force: "In situations where any force used is capable of causing serious injury or death, there is a requirement that, whenever feasible, the deputy must first warn the suspect that force will be used if there is not compliance." While estimating that such a warning would have taken only a "split second," Deputy King testified that he did not feel he had time to issue such a warning. According to Deputy King's own testimony, however, Hayes was still at least six feet away from him at the time he was shot. It is not clear that a warning in this situation was unfeasible.

**[20]** The California Supreme Court has held that it is improper for a trial court to remove the issue of negligence from a jury where the evidence most favorable to the plaintiff could support a view that the force used was unreasonable. *See Grudt*, 2 Cal.3d at 587 (holding the trial court erred in removing the issue of negligence from the jury where the evidence most favorable to the plaintiff could have supported a view that Grudt, driving in a high crime area late at night and hailed to stop by men in plain clothes, thought he was going to be robbed, tried to elude the robbers, and was then shot by the plainclothes officers when his car stopped at an intersection). Seen in the light most favorable to Appellant, Hayes was complying with Deputy King's order when he raised the knife and posed no clear threat at the time he was shot without warning. Accordingly, the reasonableness of the force used here cannot be determined as a matter of law.

**[21]** The circumstances of this case can be viewed in multiple ways: as "suicide by cop," as officers suddenly threatened with a deadly weapon, or as a depressed man simply

holding a knife when confronted by law enforcement. As with most excessive force claims, the correct determination of the circumstances here will require a careful balancing of the evidence and the inferences that can be made therefrom. For just this reason, this court has stated on many occasions that summary judgment in excessive force cases should be granted sparingly because the reasonableness of force used is ordinarily a question of fact for the jury. *See, e.g., Smith*, 394 F.3d at 701; *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); *Liston v. County of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (citing multiple cases). Accordingly, we reverse summary judgement on the claim that the deputies' use of deadly force was negligent and remand the claim for further proceedings.[8]

## III.   CONCLUSION

For the foregoing reasons, we reverse the district court's finding that Chelsey Hayes has standing to assert survival claims related to her father's Fourth Amendment rights and remand for further proceedings on the issue, including whether Appellant has standing to assert a *Monell* claim against the County on this basis. We affirm the summary judgement as to Appellant's § 1983 claim based on a violation of her rights under the Fourteenth Amendment, as well as the *Monell* claim stated against the County on the same basis. We reverse the summary judgement on Appellant's negligent wrongful death claim and remand for further proceedings on this claim.

**AFFIRMED in part, REVERSED in part, and REMANDED.** No party to recover costs on this appeal.

---

[8]We note that the district did not address whether the deputies or the County would be entitled to statutory immunity under California law, and we decline to address this issue in the first instance here.

RAWLINSON, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the Plaintiff failed to adequately support her substantive due process claim. I also agree that the district court properly granted summary judgment in favor of the County of San Diego on that claim. I therefore join Section II.B. of the majority opinion. However, I disagree with the balance of the majority opinion, primarily because the record does not raise a material issue of fact regarding the amount of force used in this case.

Before resolving the legal issues in this case, it is appropriate to focus on the facts and the circumstances the officers encountered upon arrival. The impetus for the officers' response was a call from a neighbor who reported hearing screaming from the house where the decedent Shane Hayes resided. Hayes' girlfriend advised Deputy King that she and Hayes had been arguing. When the two officers entered the residence, it was so dimly lit that Deputy King was forced to use his flashlight. Hayes was located approximately eight feet from Deputy King. When Deputy King ordered Hayes to show his hands, Hayes revealed a large knife in his raised right hand, with the tip pointed downward. At the same time, Hayes was steadily advancing toward Deputy King. Only four seconds elapsed between the time Deputy King ordered Hayes to show his hands and the shooting. It is undisputed that Hayes continued to advance toward Deputy King with the knife raised. Hayes' girlfriend described Hayes as having a "clueless" expression on his face as he continued to advance. Indeed, Deputy King testified that he shot Hayes "[b]ecause [Hayes] wasn't stopping." At the hearing on the summary judgment motion filed by the County, the Plaintiff did not challenge the officers' testimony regarding the sequence of events. Her only challenge was to the location of the knife once Hayes fell to the floor upon being shot, which challenge did not raise a material issue of fact.

This case is similar to *Reynolds v. County of San Diego*, 84 F.3d 1162, 1170 (9th Cir. 1996), *overruled on a different ground in Acri v. Varian Associates*, 114 F.3d 999, 1000 (9th Cir. 1997). As in this case, the deceased in Reynolds "was behaving in a strange manner and wielded a knife . . ." *Id.* In *Reynolds*, we reiterated the United States Supreme Court's holding that the use of deadly force by a police officer is reasonable so long as the officer "has probable cause to believe that the [person against whom the force is used] poses a significant threat of death or serious physical injury to the officer . . ." *Id.* at 1167. We also noted the Supreme Court cautioned that in making that determination, we must be ever mindful that what we view at our leisure with the perspective of 20-20 hindsight often occurs in rapid sequence. *See id.*

As commonly happens in deadly force cases, the events in this case unfolded rapidly within a dimly lit, confined space. By Hayes' girlfriend's account, Hayes kept coming toward Deputy King with an expression on his face "like nothing's working upstairs." Faced with a steadily advancing Hayes wielding a large knife, the officer had probable cause to believe that his life was in danger.

The majority opinion remands the case to the district court for a determination of whether the Plaintiff may maintain a survivorship action. However, in my view, regardless of whether Plaintiff may maintain an action, no excessive force was used by Deputy King. Rather than remanding the case to the district court, I would affirm the district court's ruling that no excessive force was used.[1]

---

[1]Because I would conclude that the use of force was reasonable, I also disagree with the deadly force discussion included as part of the majority's analysis of the negligence issue. *See* Majority Opinion, pp. 18-25. The majority focuses on dissecting the factors and minimizes the most salient fact—that Deputy King was unexpectedly confronted with a knife-wielding individual advancing steadily toward him. As our precedent makes clear, an officer need not wait for the assailant to strike a blow

As to the Plaintiff's negligence claim, the majority interprets *Hernandez v. City of Pomona*, 46 Cal. 4th 501 (2009) to support its conclusion that Plaintiff had a viable negligence claim. Preliminarily, I note that the issue of the viability of a negligence action was not the focus of the Supreme Court's decision. In the words of the California Supreme Court, review was granted:

> to consider the following question: When a federal court enters judgment in favor of the defendants on a civil rights claim brought under 42 United States Code section 1983 (section 1983), in which the plaintiffs seek damages for police use of deadly and constitutionally excessive force in pursuing a suspect, and the court then dismisses a supplemental state law wrongful death claim arising out of the same incident, what, if any preclusive effect does the judgment have in a subsequent state court wrongful death action?

*Id.* at 505. Absolutely no mention was made of opining on the viability of negligence claims predicated on pre-shooting conduct. In fact, the California Supreme Court expressly declined to address whether a negligence cause of action was available in theory. *See id.* at 521 n.18 ("In light of our analysis and conclusion, we do not address defendants' claims that they owed no duty of care regarding their preshooting conduct . . .").

The issue that the Supreme Court declined to address is the very issue the Courts of Appeal addressed in *Munoz v. City*

---

before acting to ensure his safety and the safety of others. *See Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (en banc) ("[W]here a suspect threatens an officer with a weapon such as a gun or a knife, the officer is justified in using deadly force.") (citations omitted); *see also Blanford v. Sacramento County*, 406 F.3d 1110, 1115-16 (9th Cir. 2005).

*of Union City*, 120 Cal. App. 4th 1077, 1093-99 (2004) and *Adams v. City of Fremont*, 68 Cal. App. 4th 243, 264-65 (1999), the cases relied on by the district court to hold that there was no tort duty owed to Hayes for the officers' pre-shooting actions.

It would stand to reason that if the California Supreme Court was inclined to overrule the holdings of *Munoz* and *Adams*, it would have done so. Instead, the California Supreme Court expressly reserved that question for another day. The majority disregards the resulting continuing vitality of *Munoz* and *Adams* when it declares that Plaintiff may pursue a claim for preshooting negligence against Deputy King. I disagree with that approach. Instead, I agree with the district court that no duty of care was owed to Hayes for any pre-shooting conduct.

In summary, because I agree with the district court that no deadly force was used, I would affirm the entry of summary judgment in favor of Defendants.